44642. FOSTER v. GEORGIA BOARD OF CHIROPRACTIC
EXAMINERS.
(359 SE2d 877)

MARSHALL, Chief Justice.

The appellant, Charles Foster, is a licensed chiropractor in the State of Georgia. The state instituted administrative proceedings against him, seeking the imposition of sanctions on grounds that in dispensing certain nutritional substances for treatment of a patient, he engaged in the prescribing of drugs and thereby exceeded the stat-

---

[3] Ga. L. 1962, p. 140, § 6, as amended, Ga. L. 1985, p. 1393.

utorily authorized scope of his license to practice chiropractic in this state. The hearing officer concluded that the appellant had exceeded the scope of his chiropractic license, and sanctions were imposed. In reviewing the hearing officer's decision, the appellee, the Georgia Board of Chiropractic Examiners, agreed that the appellant was not authorized to prescribe the nutritional treatment, but the Board modified the sanctions imposed by the hearing officer. The superior court summarily affirmed the decision of the Board. The appellant filed an application for discretionary appeal in this court, challenging the constitutionality of the applicable statutory provisions as construed by the tribunals below. We granted the appellant's application for discretionary appeal, for the purpose of deciding "[w]hether the Georgia Code allows chiropractors to prescribe nutritional treatment for their patients, and if so, to what extent." For reasons which follow, we hold that, at least under the circumstances here, the chiropractor was not authorized to prescribe the nutritional treatment. We, therefore, affirm.

*Facts*

Based upon facts stipulated by counsel for the parties, the hearing officer found and concluded as follows:

On September 19, 1984, a patient, referred to as L. R. (who was, in fact, an undercover agent for the state), visited the appellant's office. The patient completed a medical history form, indicating that he was generally feeling tired and run down and that he was taking "Corgard," a heart medication. The appellant indicated to the patient that a complete blood history and urinalysis would be needed.

The appellant consulted with a licensed medical doctor regarding the patient's condition and the advisability of having a blood history done by a laboratory. The licensed medical doctor concurred that a blood history should be done on the patient and instructed the appellant to have a licensed practical nurse withdraw the blood from the patient, which was done. The blood samples were sent to a laboratory for analysis, and a blood-analysis report was sent by the laboratory to the appellant.

From the blood-analysis report, the appellant prepared a report, entitled a "Bio-Chemical Interpretation," for the patient. From this, the appellant prescribed a course of treatment for the patient's condition, which included taking the following substances, pursuant to specific instructions as to the amount and timing of the substances to be taken:

1. Samolinic
2. Digestaid
3. Prostadyn

4. Supra Renal 220
5. Organamin
6. Free Amino

These substances may be sold without prescription and are, in fact, sold in food stores by merchants and other lay persons; in addition, the substances are not habit-forming and do not require medical supervision for use. The substances are used by the appellant to treat dietary deficiencies and to enhance the well-being of the patient.

The hearing officer concluded that the use of the substances in question by the appellant to treat the patient constitutes the prescribing or use of drugs, in violation of the Georgia Chiropractic Practices Act. OCGA § 43-9-1 et seq. (referred to hereinafter as the Georgia CPA).

Based on this, the hearing officer, likewise, concluded that the appellant's conduct constitutes unprofessional conduct harmful to the public and of a nature likely to jeopardize the interest of the public, in violation of OCGA § 43-9-12 (a) (b). The hearing officer further concluded that the appellant's conduct also constitutes a violation of OCGA §§ 43-9-12 (a) (8) and 43-34-46, in that the appellant has practiced medicine in Georgia without a license. The hearing officer ordered that the appellant's license to practice chiropractic in Georgia be suspended for a period of three years, but that said sanction be suspended and the appellant's license be put on probation for the three-year period.

Pursuant to OCGA § 50-13-17 (a), the appellant applied to the appellee for review of the hearing officer's decision. The appellee adopted the hearing officer's findings of fact and conclusions of law. However, the sanction imposed against the appellant was amended to provide that the appellant's license to practice chiropractic in this state would be suspended, but placed on probation for a two-year period, conditioned on his abiding by all state and federal laws, and administrative regulations, relating to the practice of chiropractic in Georgia. In addition, the appellee imposed a $500 fine against the appellant.

### Georgia's Statutory Scheme

"As defined by OCGA § 43-9-1 . . . , ' "(c)hiropractic" means the adjustment of the articulation of the human body, including ilium, sacrum, and coccyx, and the use of electric X-ray photography, provided that the X-ray shall not be used for therapeutical purposes.' This definition has existed unchanged since its original enactment by Ga. L. 1921, pp. 166, 167. The following language was, however, added to the statute in 1977: 'The term "chiropractic" shall also mean that separate and distinct branch of the healing arts whose science and art

utilize the inherent recuperative powers of the body and the relationship between the musculoskeletal structures and functions of the body, particularly of the spinal column and the nervous system, in the restoration and maintenance of health. Chiropractic is a learned profession which teaches that the relationship between structure and function in the human body is a significant health factor and that such relationships between the spinal column and the nervous system are most significant, since the normal transmission and expression of nerve energy are essential to the restoration and maintenance of health. However, the term "chiropractic" shall not include the use of drugs or surgery.' Ga. L. 1977, p. 232. See OCGA § 43-9-1 (2), supra.

"The authorized scope of practice of chiropractors is further delineated by OCGA § 43-9-16 . . . , which provides in pertinent part, as follows: '(a) Chiropractors who have complied with this chapter shall have the right to adjust patients according to specific chiropractic methods.' " (Footnote omitted.) *Metoyer v. Woodward*, 176 Ga. App. 826, 827-828 (338 SE2d 286) (1985).

The prohibition against chiropractors' use of drugs or surgery, as contained in OCGA § 43-9-1 (2), supra, is repeated in OCGA § 43-9-16 (c), which provides: "Chiropractors shall not prescribe or administer medicine to patients, perform surgery, or practice obstetrics or osteopathy."

### Basic arguments advanced by the Appellant

The appellant's basic argument, as a matter of statutory construction, is that, based on the status of chiropractic in 1921, the General Assembly defined it as an adjustment of the articulation of the human body. However, the appellant asserts that subsequent developments in chiropractic education and training embrace nutrition, among other modalities, as a proper part of chiropractic, and the 1977 redefinition of chiropractic was intended to embrace such modalities within the official, extremely broad definition of chiropractic. In support of this argument, the appellant further contends that in all accredited chiropractic colleges in this country, students are specifically instructed in the diagnostic essentials of how nutrition relates to human health and the recuperative powers of the human body.

More specifically, referring to the language employed in the 1977 statutory redefinition of chiropractic in Georgia, the appellant argues that "the inherent recuperative powers of the body" can be altered by neurological dysfunction and cannot be restored without providing man with proper vitamins and minerals, which are necessary for "the normal transmission and expression of nerve energy . . . essential to the restoration and maintenance of health." So this argument proceeds, nutrition also aids the process of spinal adjustment. The appel-

lant seeks to distinguish vitamins from drugs by arguing that vitamins are naturally occurring substances that promote the free flow of energy, whereas drugs "insult the totally mobile and free-flowing expression of nerve energy."

Thus, the appellant's contention in this regard is that by proper nutrition through the ingestion into the human body of vitamin and mineral substances, chiropractic seeks to "utilize the inherent recuperative powers of the body and the relationship between musculoskeletal structures and functions of the body, particularly of the spinal column and the nervous system, in the restoration and maintenance of health," since "the normal transmission and expression of nerve energy are essential to the restoration and maintenance of health."

### Cases from other Jurisdictions interpreting their Chiropractic Statutes

(1) In *King v. Bd. of Med. Examiners*, 151 P2d 282 (5) (Cal. App. 1944), vitamins and other non-prescription substances were prescribed by a practitioner of a drugless health profession for a patient, but not for the treatment of a disease or ailment. There, it was held that the defendant was not guilty of practicing medicine without a license.

(2) In *State v. Baker*, 48 SE2d 61 (N.C. 1948), an osteopath was convicted of practicing medicine without a license by prescribing drugs for the treatment of ailments.

Under North Carolina law, osteopathy, like chiropractic, is a system of treating diseases of the human body without drugs or surgery.[1]

In *Baker*, the defendant had advised a patient, a nursing mother, to feed her baby a certain type of milk. He also advised the patient to procure for herself various patent and proprietary preparations, including vitamin preparations, with directions as to the mode of administration. These preparations were obtainable without a prescrip-

---

[1] "The osteopath 'heals by means of a system of rubbing and kneading the body, applying hot or cold baths, and prescribing diet and exercise for the treatment, relief, and cure of bodily infirmity or disease, without the use of medicine, drugs, or surgery.' 21 R.C.L., Physicians and Surgeons, Sec. 2." *State v. Baker*, supra, 48 SE2d at p. 65.

However, under Georgia's statutory law, the practice of naturopathy is the functional equivalent of the practice of osteopathy under North Carolina law, see OCGA § 43-34-1 (a); and, under Georgia law, an osteopath is engaged in the practice of medicine with a D.O. degree, rather than an M.D. degree. See OCGA §§ 43-34-21; 43-34-27.

More generally " '[o]steopathy' has been defined . . . as a system of treatment of certain parts and tissues of the body by manipulations with the hands, without the use of medicine, drugs, or surgery. Osteopaths were formerly classified as drugless practitioners under various statutes, but are now increasingly more often governed by statutes relating to the practice of medicine." (Footnotes omitted.) 61 AmJur2d, Physicians, Surgeons, etc., § 9, p. 157 (1981).

tion from a physician.

The North Carolina Supreme Court, stating that the lexicographers are in agreement, held that a drug is "any substance or preparation used in treating disease." 48 SE2d at p. 66. Consequently, the court concluded, "[w]hether a vitamin preparation is a drug or a food is ordinarily a question of fact. The same substance may be a drug under one set of circumstances, and not a drug under another. The test is whether it is administered or employed as a medicine. *Stewart v. Robertson*, 45 Ariz. 143 (40 P2d 979, 40 C.J. 625)." Id.

On this basis, the court concluded that the defendant did not exceed the bounds of his osteopathic license by advising the nursing mother with respect to the child's nourishment, or by prescribing the vitamin preparations "used solely for nourishment." Id. However, the court held that other preparations, although available to the general public without prescription, were administered by the defendant in the treatment of his patient's ailments and were, therefore, drugs "within the meaning of the law." Id. at p. 67.

In *Baker*, the legislature had defined osteopathy "to be the science of healing without the use of drugs, as taught by the various colleges of osteopathy recognized by the North Carolina Osteopathic Society." G.S. § 90-129. The defendant in *Baker* argued that if the treatment of patients in the manner engaged in by him was taught in recognized colleges of osteopathy, such treatment would be statutorily authorized. The court in *Baker* found this contention "interesting, but not convincing. The statutes clearly contemplate that osteopathic physicians shall diagnose and treat diseases by employing osteopathy. The words 'as taught by the various colleges of osteopathy recognized by the North Carolina Osteopathic Society' do not set at large the signification of 'osteopathy,' permitting the colleges to give it any meaning they choose. The thing to be taught is osteopathy — 'the science of healing without the use of drugs.' The legislature merely authorizes the colleges to determine, select, and teach the most desirable methods of doing what is comprehended within the term 'osteopathy.' The colleges can not change the law of North Carolina, or widen the scope of the osteopath's certificate so as to permit him to practice other systems of healing by the simple expedient of varying their curricula. [Cits.]." Id. at p. 65.

(3) In *State v. Winterich*, 105 NE2d 857 (Ohio St. 1952), the Ohio Supreme Court held that substances, although classifiable as foods, become "drugs" within legal contemplation if prescribed by chiropractors for patients and if such substances are "intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease . . ." 105 NE2d at p. 861. However, the chiropractor's conviction for engaging in the practice of medicine without a license was reversed because of an error in the trial court's jury charge.

(4) In *People v. Bovee*, 285 NW2d 53, 16 ALR4th 48, (Mich. App. 1980), the Michigan Court of Appeals was called upon to interpret Michigan's chiropractic statute, which, at the time, defined chiropractic as "the locating of misaligned or displaced vertebrae of the human spine," but also included within that definition "the procedure preparatory to and the adjustment by hand of such misaligned or displaced vertebrae . . ." M.C.L. § 338.156; M.S.A. § 14.596. Citing *State v. Wilson*, 528 P2d 279 (Wash. App. 1974), and *Kelley v. Raguckas*, 270 NW2d 665, 668-669. (Mich. App. 1978), the Michigan Court of Appeals in *Bovee* held that to allow chiropractors to dispense nonprescription drugs as part of a procedure preparatory to a spinal manipulation would be " 'directly contrary to the philosophical foundation of the chiropractic profession . . . [and] . . . the universally accepted view that the chiropractic profession is limited to the manual adjustment of the spine. Drugs play no part in the chiropractor's approach to health.' " 285 NW2d at p. 59.

The Michigan legislature subsequently amended that state's chiropractic statute to provide that the "[p]ractice of chiropractic includes . . . (iii) [t]he use of analytical instruments, *nutritional advice*, rehabilitative exercise and adjustment apparatus . . . for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine. The practice of chiropractic does not include . . . the dispensing or prescribing of drugs or medicine." (Emphasis supplied.) M.C.L. § 331.16401 (1) (b); M.S.A. § 14.15 (16401) (1) (b).

(5) In *Attorney General v. Beno*, 373 NW2d 544 (Mich. 1985), the Michigan Supreme Court, citing *Attorney General v. Recorders Court Judge*, 285 NW2d 53 (Mich. App. 1979), held that the Michigan legislature's inclusion of the foregoing statutory provision on nutritional advice did not authorize the use of vitamins and food supplements for treatment of disease or other human ailment, but only authorized chiropractors to dispense vitamins or food supplements when employed as part of a program to correct a subluxation or misalignment of the spine.

(6) In *State v. Wilson*, 528 P2d 279, supra, the Washington Supreme Court held that chiropractors could not give or prescribe minerals, vitamins, or food supplements for the treatment of disease. W.A.C. 113-12-080.

Shortly after rendition of the decision in *Wilson*, the Washington legislature amended their chiropractic statute to read: "[N]othing herein shall be construed to prohibit the rendering of dietary advice." Wash. Rev. Code Ann. § 18.25.005.

(7) In *Stockwell v. Washington St. Chiropractic Disciplinary Bd.*, 622 P2d 910 (Wash. App. 1981), the Washington Court of Appeals construed the "dietary advice" provision, along with the vitamin/food supplement dispensation prohibition, both of which were

contained in Washington's statutory law, to mean that, in the course of rendering dietary advice, chiropractors were authorized to dispense vitamins, minerals, and food supplements, although they were prohibited from dispensing these substances for the treatment of disease.

(8) In *Norville v. Mississippi St. Med. Assn.*, 364 S2d 1084 (Miss. 1978), the Mississippi Supreme Court was called upon to interpret Mississippi's Chiropractic Licensing Statute, Miss. Code Ann. § 73-6-1, which provided, in pertinent part, that, "[t]he practice of chiropractic involves the analysis of any interference with normal nerve transmission and expression, and the procedure preparatory to and complementary to the correction thereof, by an adjustment of the articulations of the vertebral column and its immediate articulations for the restoration and maintenance of health without the use of drugs or surgery."

There, the court, rejecting the argument that vitamins facilitate the administration of spinal adjustments and nerve transmissions, held that a chiropractor's prescribing of vitamins to cure a patient's ailments constitutes the unauthorized practice of medicine.

### Georgia Case Law

(9) In *Metoyer v. Woodward*, 176 Ga. App. 826, supra, the Georgia Court of Appeals, agreeing with an opinion rendered by the Attorney General of the State of Georgia (Opinions of the Attorney General, 1984, p. 116), held that the 1977 statutory redefinition of chiropractic in Georgia, including the legislative determination contained therein that chiropractic is a learned profession, did not expand its authorized scope of practice beyond the existing statutory authorization to adjust the articulation of the human body according to specific chiropractic methods.[2]

### Holding with respect to the Construction of the Georgia CPA

(10) We are in agreement with the Georgia Court of Appeals' decision in *Metoyer v. Woodward*, supra, as well as the previously cited decisions rendered by the courts of other states.

---

[2] Specifically, *Metoyer* held that chiropractors are not authorized to treat soft-tissue injuries through the use of such modalities as galvanism and ultrasound diathermy. "Galvanism [is] 'electrical muscle stimulation,' the purpose of which [is] to 'create a sedative type effect by stimulating the endorphins, which is a natural type morphine stimulated by the brain cells within the body, and to aid as a reduction in pain or pain control as well as creating a chemical change in the tissues to promote healing and, again, to reduce muscle spasm.' Ultrasound [is] a form of diathermy which produce[s] a 'deep vibratory heat' within the muscle tissue, the purpose of which [is] to increase the flow of blood to such tissues and thereby reduce muscle spasms." *Metoyer v. Woodward*, supra, 176 Ga. App. at p. 827.

Consequently, we hold that since the Georgia CPA does not authorize chiropractors to prescribe or dispense vitamins, minerals, or nutritional substances,[3] and since the appellant here did prescribe such items for treatment of a patient's ailments, such conduct constituted the unauthorized practice of medicine in this state.

## Appellant's remaining Non-Constitutional arguments

(11) The appellant argues that vitamins, minerals, and food supplements should not be treated as drugs under the Georgia CPA, since such substances are treated as foods under the Georgia Drug and Cosmetics Act (GDCA), OCGA § 26-3-1 et seq., as well as the federal Food, Drug, and Cosmetics Act (FDCA), 21 USC § 301 et seq. The appellant reasons that the GDCA and FDCA are intended to serve the broad purpose of preventing misbranded or adulterated substances from being marketed to the American public; and, so this argument goes, since the substances at issue here are not considered drugs under these statutes, they should not be considered drugs under the CPA. We find the appellant's argument to be unpersuasive for several reasons.

It is true that the GDCA defines "drug" as meaning, among other things, "[a]rticles other than food . . ." OCGA § 26-3-2 (6) (C). However, the GDCA also defines "drug" to mean "[a]rticles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man." OCGA § 26-3-2 (6) (B). The FDCA contains similar provisions. See 21 USC § 321 (g) (1) (B), which corresponds to OCGA § 26-3-2 (6) (B). See also 21 USC § 321 (g) (1) (C), which corresponds to OCGA § 26-3-2 (6) (C). In addition, cognate provisions are also found in the Georgia Pharmacy Act. See OCGA § 26-4-2 (7) (B) and (C). "[A]n article that happens to be a food but is intended for use in the treatment of disease fits squarely within the drug definition in part B of Section 321 (g) (1) [of the FDCA] and may be regulated as such. [Cits.]" *Nutrilab, Inc. v. Schweiker*, 713 F2d 335, 336 (7th Cir. 1983).[4]

Furthermore, there exists a separate state statute (the Georgia Food Act, OCGA § 26-2-20 et seq.) which prohibits the adulteration and misbranding of food; and, of course, the FDCA prohibits the misbranding and adulteration of foods as well as drugs. See 21 USC § 331

---

[3] In contrast, although "naturopathy" is defined under Georgia statutory law as a healing art which avoids the use of drugs or surgery, it is also defined as embracing "the use of such nutritional substances as are naturally found in and are required by the body." OCGA § 43-34-1 (a).

[4] In addition, under certain circumstances, 21 USC § 350 (a) (1) (B) authorizes the Secretary of Health and Human Services to classify a vitamin, mineral, or food as a drug when represented for use by individuals in the treatment or mitigation of diseases or disorders.

(a), (b), (c).

*United States v. An Article of Drug . . . Bacto-Unidisk . . . .,* 394
U. S. 784 (89 SC 1410, 22 LE2d 726) (1969), teaches that Congress
intended the term "drug" to have an expansive meaning under the
FDCA so as to authorize the then Secretary of Health, Education and
Welfare (now, the Secretary of Health and Human Services) to sub-
ject a broader range of substances to the pre-market clearance regula-
tions of the FDCA, as opposed to only the misbranding and adultera-
tion proscriptions of that Act.

## Appellant's Constitutional arguments

(12) The appellant argues that if the Georgia CPA is construed as
prohibiting chiropractors from prescribing nutritional treatment for
patients, it is unconstitutional on various interrelated grounds.

The appellant argues that, as construed here, the Georgia CPA is
not rationally related to the proper end of protecting the public and,
thus, as a matter of substantive due process, unconstitutionally de-
prives chiropractors of the liberty to engage in the practice of their
profession. See generally *Watson v. Maryland,* 218 U. S. 173 (30 SC
644, 54 LE 987) (1910); *England v. Louisiana St. Bd. of Med. Exam-
iners,* 263 F2d 661 (5th Cir. 1959) and cits. The appellant also argues
that, in that common merchants are allowed to sell the nutritional
substances to customers without a prescription, in that the substances
do not require medical supervision for use, and in that the substances
are not habit-forming, the Georgia CPA violates the Equal Protection
Clause if construed as prohibiting chiropractors from prescribing or
recommending such substances in the treatment of patients.

(13) These arguments are without merit for the reasons given in
*Norville v. Mississippi St. Med. Assn.,* 364 S2d 1084, supra, wherein
the Mississippi Supreme Court stated:

"We are fully cognizant that any layman can obtain such vita-
mins and that any retailer can sell such vitamins. Purchase of or sale
of vitamins is not[,] however[,] the vice which is condemned here.
Rather[,] the vice condemned and that which constitutes the unli-
censed practice of medicine is (1) prescription of vitamins, (2) to cure,
(3) an ailment or disease, (4) for compensation.

"The chiropractor on the present facts does not simply sell vita-
mins to a customer who asks for them as does a retailer. Rather, he
represents to a patient who has come to him that such vitamins will
cure a disease or ailment. Further, unlike the relative or friend who
recommends that someone take vitamins for nutrition or to prevent
colds, and neither expects nor receives any compensation for such 'ad-
vice,' the chiropractor in a professional capacity advises the patient to
take the vitamins for the ailment or disease, charges compensation for

such advice, and may cause the patient to think his ailment or disease will thereby be cured. This is the vice condemned and the danger of such is amply demonstrated by the record." 364 S2d at p. 1089. Accord, e.g., *State v. Baker*, supra.

(14) "The regulation of health professions, for the preservation and protection of public health, is universally regarded as a duty of the State in the exercise of inherent police power. 61 AmJur2d, Physicians, Surgeons, Etc., § 132 (1981). Because the health professions are invested with a strong public interest, statutes regulating them should be measured against the rational[-]basis standard. See *MRM, Inc. v. City of Davenport*, 290 NW2d 338, 341 (Iowa 1980)." *State, ex rel. Iowa Dept. of Health v. Van Wyk*, 320 NW2d 599, 605 (7) (Iowa 1982).

"The Fourteenth Amendment permits states wide discretion in enacting laws which affect some group of citizens differently from others, the due process or equal protection safeguards contained therein being offended only if the resultant classifications or deprivations of liberty rest on grounds wholly irrelevant to a reasonable state objective. *McGowan v. State of Maryland*, 366 U. S. 420, 425-426 (81 SC 1101, 6 LE2d 393) (1961). Therefore, unless a statutory classification is arbitrary, or not founded on any substantial distinction suggesting the necessity or propriety of such legislation, the courts have no right to interfere with the exercise of legislative discretion. In the instant case, we are of the opinion the classification of chiropractors as a distinct class of persons who [have not been authorized to prescribe nutritional treatment for patients' ailments] does not violate the Fourteenth Amendment guaranteeing equal protection of the laws, nor does it amount to a violation of life, liberty or property without due process of law. This view is based on our recognition that it is clearly within the province of the General Assembly to determine that, to protect the public health and general welfare, only those persons admitted to the practice of medicine should be authorized to perform the activities in question here." (Footnote omitted.) *Ky. Assn. of Chiropractors, Inc. v. Jefferson County Med. Society*, 549 SW2d 817, 822 (Ky. 1977).[5]

(15) In addition, the appellant argues that the terms "drugs" and "medicine," as defined by the lower tribunals in this case, are unconstitutionally vague.

This argument, likewise, is without merit. "The meaning of the statutory scheme challenged here is fairly ascertainable by reference

---

[5] This disposes of the appellant's argument that, as construed here, the Georgia CPA unconstitutionally creates an irrebuttable presumption that all chiropractors are incompetent to prescribe nutritional substances for patients. See *Cleveland Bd. of Education v. LaFleur*, 414 U. S 632 (94 SC 791, 39 LE2d 52) (1974) and cits.

to the statutory language and our opinions. The vagueness challenge is without merit." *State, ex rel. Iowa Dept. of Health v. Van Wyk,* supra, 320 NW2d at p. 605. "[Appellant's] complaint is more properly an attack on the propriety of the legislative decision to impose rather extensive limitations on the practice of chiropractic. If that legislative decision is unwise, short sighted or improvident, the remedy is with the Legislature and not with the courts." *Demido v. Kelly,* 299 NW2d 43, 45 (5) (Mich. App. 1980).

As thus stated in *Demido v. Kelly,* supra, and as argued by the appellee herein, the appellant's remedy in this case lies with the General Assembly and not the courts.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 8, 1987 —
RECONSIDERATION DENIED SEPTEMBER 8, 1987.

*Reynolds & McArthur, Charles M. Cork III,* for appellant.

*Michael J. Bowers, Attorney General, H. Perry Michael, First Assistant Attorney General, Stephanie B. Manis, Senior Assistant Attorney General, Mark H. Cohen, Assistant Attorney General,* for appellee.

*Demetrius Mazacoufa, Richard L. Greene, Jerry L. Sims, Daniel J. Weber,* amici curiae.