Scott *vs.* The State of Georgia.

---

CHARLOTTE SCOTT, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. The Code of Georgia, adopted by the new Constitution, forever prohibits the marriage relation between white persons and persons of African descent, and declares such marriages *null* and *void*.

2. This section of the Code is not repealed by, nor is it inconsistent with, that part of the Constitution which declares that "the social *status* of the citizen shall never be the subject of legislation." That clause of the Constitution absolutely denies to the Legislature the power to pass laws in future regulating the social *status*, or compelling the two races to unite in social intercourse. As the laws then in existence allowed churches, for instance, to determine for themselves who should occupy their seats, and where they should sit, and permitted railroad and steamboat companies, and hotel-keepers to classify and assign places to those using their accommodations, according to social *status* and grade, as they might think proper, the Constitution puts it beyond the power of the Legislature ever to enact any law compelling them to make different classifications, or to group together in social intercourse those who do not recognize each other as social equals. As the social relations of citizens are not the proper subjects of legislation, the Constitution has wisely put the matter at rest, by denying to the Legislature the power to repeal or enact laws on that subject.

See opinion of McCAY, J., as to the Constitutional point.

Criminal law. Marriages of negroes and whites. Decided by Judge CLARK. Dougherty Superior Court. December Term, 1869.

Charlotte Scott was indicted for cohabiting and having sexual intercourse with one Leopold Daniels, she being " an unmarried woman of color," and he being " an unmarried white man." On the trial, her daughter testified, that about three months before the trial, Charlotte. came home from Macon with Leopold; that they said they had been married, and addressed and treated each other as man and wife, and regularly slept together. She said, " it was understood, and so considered by the family, that they were married, and all the family have looked upon them as man and wife." This quoted testimony was ruled out, upon objection made by the Solicitor General. It was conceded that defendant was a negro.

The State resting its case here, LEOPOLD DANIELS was introduced, and testified that he was a Frenchman, born in Leon, and was married to said Charlotte by a negro preacher in Macon. The Court ruled out his testimony.

The motion for new trial recites, that said CHARLOTTE was introduced to show that she had had a marriage certificate, and that it was lost, so as to prove the marriage otherwise, but the Court would not allow her to testify; her counsel proposed to have her and Leopold Daniels then married by the Judge, they being willing to marry, but he refused to perform such ceremony, saying, they might go out and get some one to perform it, if they could find any one who would.

The evidence being closed, defendant's attorney requested the Court to charge the jury, that if the testimony showed that Charlotte and Leopold Daniels were married, they must acquit her. The Court refused so to charge, and charged the jury that if defendant had married Leopold Daniels, the marriage was null and void. She was found guilty.

Her attorney moved for a new trial, upon the grounds that the Court erred in not performing said marriage ceremony, in refusing to let her testify as to the loss of her marriage certificate, in rejecting that part of her daughter's testimony quoted above, in ruling out Daniel's testimony, in

Scott *vs.* The State of Georgia.

refusing to charge as requested, and in charging as he did, and because the verdict was contrary to law and the evidence. The Court overruled this motion, and for that error is assigned on each of said points.

H. MORGAN, for plaintiff in error.

R. H. WHITELY, Solicitor General, for the State.

BROWN, C. J.

The record in this case presents a single question for the consideration and adjudication of this Court. Have white persons and persons of color the right, under the Constitution and Laws of Georgia, to intermarry, and live together in this State as man and wife? The question is distinctly made, and it is our duty to meet it fairly, and dispose of it.

The Code of Georgia, as adopted by the new Constitution, section 1707, forever prohibits the marriage relation between the two races, and declares all such marriages *null* and *void.* With the policy of this law we have nothing to do. It is our duty to declare what the law is, not to make law. For myself, however, I do not hesitate to say, that it was dictated by wise statesmanship, and has a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but is always productive of deplorable results. Our daily observation shows us, that the offspring of these unnatural connections are generally sickly and effeminate, and that they are inferior in physical development and strength, to the full-blood of either race. It is sometimes urged that such marriages should be encouraged, for the purpose of elevating the inferior race. The reply is, that such connections never elevate the inferior race to the position of the superior, but they bring down the superior to that of the inferior. They are productive of evil, and evil only, without any corresponding good.

I do not propose to enter into any elaborate discussion of the question of policy at this time, but only to express my opinion, after mature consideration and reflection.

The power of the Legislature over the subject matter when the Code was adopted, will not, I suppose, be questioned. The Legislature certainly had as much right to regulate the marriage relation by prohibiting it between persons of different races as they had to prohibit it between persons within the Levitical degrees, or between idiots. Both are necessary and proper regulations. And the regulation now under consideration is equally so.

2. But it has been urged by the learned counsel for the plaintiff in error that the section of the Code under consideration is in conflict with the eleventh section of the first Article of the Constitution of this State, which declares that, " The social *status* of the citizen shall never be the subject of legislation." In so far as the marriage relation is connected with the social *status*, the very reverse is true. That section of the Constitution forever prohibits legislation of any character, regulating or interfering with the social *status*. It leaves social rights and *status* where it finds them. It prohibits the Legislature from repealing any laws in existence, which protect persons in the free regulation among themselves of matters properly termed social, and it also prohibits the enactment of any new laws on that subject in future.

As illustrations, the laws in force when the Constitution was adopted, left the churches in this State free to regulate matters connected with social *status* in their congregations, as they thought proper. They could say who should enter their church edifices and occupy their seats, and in what order they should be classified or seated. They could say that females should sit in one part of the church, and males in another, and that persons of color should, if they attended, occupy such seats as were set apart for them. In all this they were protected by the common law of this State. The new Constitution forever guarantees this protection, by denying to the Legislature the power to pass any law withdrawing it or regulating the social *status* in such assemblages. And I may here remark that precisely the same protection is guaranteed to the colored churches in the regulation of social *status* in their assemblages, which is afforded the whites.

Neither can ever intrude upon the other, or interfere with their social arrangements without their consent.

The same is true of railroad and steamboat companies, and hotel keepers. · By the law in existence at the time the Constitution was adopted, they were obliged to furnish comfortable and convenient accommodations, to the extent of their capacity to accommodate, to all who applied, without regard to race or color. But they were not compelled to put persons of different races, or different sexes, in the same cars or in the same apartments, or seat them at the same table. This was left to their own discretion. They had power to regulate it according to their own notions of propriety, and to classify their guests or passengers according to race or sex, and to place them at hotels in different houses or different parts of the same house, or on railroads in different cars, or on steamboats, in different parts of the vessel, and to give them their meals at different tables. When they had made public these regulations all persons patronizing them were bound to conform to them. And those who did not like their regulations must seek accommodations elsewhere. There was no law to compel them to group together in social connection, persons who did not recognize each other as social equals. To avoid collisions and strife, and to preserve peace, harmony, and good order in society, the new Constitution has wisely prohibited the Legislature from enacting laws, compelling these companies to make new social arrangements among their patrons, or to disturb those in existence. The law shall stand as it is, says the Constitution, leaving each to regulate such matters as they think best, and there shall be no legislative interference. All shall be comfortably accommodated, but you shall not be compelled by law to force social equality either upon your trains, your boats, or in your hotels. The same remarks apply to the regulation of social *status* among families, and to the social intercourse of society generally.

This, in my opinion, is one of the wisest provisions in the Constitution, as it excludes from the halls of the Legislature a question which was likely to produce more unprofitable agitation, wrangling and contention than any other subject

within the whole range of their authority. Government has full power to regulate civil and political rights, and to give to each citizen of the State, as our Code has done, equal civil, and equal political rights as well as equal protection of the laws. But Government has no power to regulate social *status*. Before the laws, the Code of Georgia makes all citizens equal, without regard to race or color. But it does not create, nor does any law of the State attempt to enforce, moral or social equality between the different races or citizens of the State. Such equality does not in fact exist, and never can. The God of nature made it otherwise, and no human law can produce it, and no human tribunal can enforce it. There are gradations and classes throughout the universe. From the tallest arch angel in Heaven, down to the meanest reptile on earth, moral and social inequalities exist, and must continue to exist through all eternity.

While the great mass of the conquering people of the States which adhered to the Union during the late civil strife, have claimed the right to dictate the terms of settlement, and have maintained in power those who demand that the people of the States lately in rebellion, shall accord to the colored race equality of civil rights, including the ballot, with the same protection under the laws which are afforded the white race, they have neither required of us the practice of miscegenation, nor have they claimed for the colored race, social equality with the white race. The fortunes of war have compelled us to yield to the freedmen the legal rights above mentioned, but we have neither authorized nor legalized the marriage relation between the races, nor have we enacted laws or placed it in the power of the Legislature hereafter to make laws, regulating the social *status*, so as to compel our people to meet the colored race on terms of social equality. Such a state of things could never be desired by the thoughtful and reflecting portion of either race. It could never promote peace, quiet, or social order in any State or community. No such laws are of force in any of the Northern States, so far as I know, and it is supposed no considerable part of the people of any State desire to see them enacted. Indeed, the most

absolute and despotic governments do not attempt to regulate social *status* by fixed laws, or to enforce social equality among races or classes without their consent.

As already stated, we are of the opinion that the section of the Code which forbids intermarriages between the races is neither inconsistent with, nor is it repealed by, the section of the Constitution now under consideration. It therefore stands upon the statute book of the State forever prohibiting all such marriages and declaring them to be *null* and *void*.

Let the judgment of the Court below be affirmed.

(WARNER, J., furnished no opinion.)

McCAY, J.

I concur in the judgment in this case, and in the main, I concur also in the reasoning of the majority of the Court, as to the meaning of that clause of the Bill of Rights providing that the social *status* of the citizen shall never be the subject of legislation.

The Act providing that persons of different color shall not marry, is not an infringement of that provision. Marriage is a civil contract, regulated by law, and I see no reason why the prohibition against persons of different color entering into that contract is regulating the social *status* of the citizen, any more than the law regulating the age of the parties, or the laws fixing the degrees of their relationship, or the law providing that there shall be but one such contract in existence at a time, are laws regulating the social *status*. They all stand upon the same footing. They are laws regulating the marriage contract, and nothing more.

I put my concurrence solely on this ground. I do not go into the policy of the law. I think the Courts have nothing to do with that. It may be a good law, or a bad law. That is not my affair as a judge, my only sphere on the subject, is to say whether such a law is forbidden by the Constitution. I do not think it is. The Legislature had the right so to enact, just as they might say that first cousins should not marry, or persons under twenty-one years, or persons

having a particular disease or deformity, or to lay down any rule or repeal it, that may seem to it proper legislation.

These, and such laws, have no bearing on the social *status* of the citizen. They still leave persons to choose their associates, though they provide that they shall not enter into a particular civil contract.