## S95A1586. CHRISTENSEN v. THE STATE.
### (468 SE2d 188)

THOMPSON, Justice.

L. Chris Christensen was convicted by a jury of solicitation of sodomy, OCGA § 16-6-15 (a),[1] a misdemeanor, and he was sentenced to probation for a term of 12 months. He challenges the constitutionality of OCGA § 16-6-15 (a), on grounds that it violates his right to privacy and to free speech under the Constitution of the State of

---

[1] OCGA § 16-6-15 (a) provides:
A person commits the offense of solicitation of sodomy when he solicits another to perform or submit to an act of sodomy. Except as provided in subsection (b) of this Code section [which pertains to solicitation of a person under the age of 17 to perform sodomy for money], a person convicted of solicitation of sodomy shall be punished as for a misdemeanor.

Georgia.

The Rockdale County Sheriff's Department instituted an undercover operation in response to complaints from citizens who reported that they had been solicited for sex and sodomy at a public rest area along Interstate 20. A male undercover officer, fitted with a recording device, observed the male defendant in the picnic area of the rest stop. The officer saw the defendant nod his head, which he (the officer) interpreted as an invitation to approach. The officer exited his vehicle, activated the recorder, and approached the defendant. After brief conversation, the defendant asked, "what are you looking for?" The officer replied that he was open-minded, but careful. The defendant then stated that he was looking for oral sodomy, and he agreed to follow the officer to a nearby motel. While en route, the defendant's vehicle was pulled over and he was arrested. After *Miranda* warnings were administered, and a waiver executed, the defendant admitted that he was guilty of the charged offense.

1. The evidence was sufficient to support the conviction under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).[2]

2. Defendant asserts that the statute prohibiting solicitation of sodomy, OCGA § 16-6-15 (a), and the sodomy statute which is its essential component, OCGA § 16-6-2, infringe upon the privacy rights and free expression rights of adult citizens to the extent that they criminalize discussions about engaging in private, consensual, noncommercial sodomy.[3]

(a) Defendant argues that the sodomy law intrudes upon the private sexual conduct of consenting adults and thus violates the right to individual privacy under the due process clause of the Georgia Constitution.[4] This Court has long recognized a right of privacy inherent in the due process clause of the Georgia Constitution, *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 199 (50 SE 68) (1905). And we have determined that certain provisions of the 1983 Georgia Constitution confer greater rights and benefits than the federal constitution.[5]

---

[2] Defendant's actual statement to the officer, as reflected· on the tape-recording played for the jury, was: "I'm just looking for a blow job." See *Anderson v. State*, 142 Ga. App. 282 (235 SE2d 675) (1977) (such language sufficient to support a conviction for solicitation of sodomy).

[3] Standing requirements dictate that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U. S. 601, 610 (93 SC 2908, 37 LE2d 830) (1973). However, an exception has been carved out in the area of the First Amendment. Id. at 611. We thus consider defendant's freedom of expression challenge as it pertains to all adult citizens.

[4] Art. I, Sec. I, Par. I provides: "No person shall be deprived of life, liberty, or property except by due process of law."

[5] In *Bowers v. Hardwick*, 478 U. S. 186 (106 SC 2841, 92 LE2d 140) (1986), the court

See *Grissom v. Gleason*, 262 Ga. 374, 376, n. 1 (418 SE2d 27) (1992).

When a privacy interest is implicated, the state must show that the legislation has a "reasonable relation to a legitimate state purpose." *Blincoe v. State*, 231 Ga. 886, 887 (1) (204 SE2d 597) (1974). In the exercise of its police power the state has a right to enact laws to promote the public health, safety, morals, and welfare of its citizens.[6] There is also a concomitant interest in curtailing criminal activities wherever they may be committed. As was acknowledged in *Bowers v. Hardwick*, supra, 478 U. S. at 196, the law "is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." We hold that the proscription against sodomy is a legitimate and valid exercise of state police power in furtherance of the moral welfare of the public. Our constitution does not deny the legislative branch the right to prohibit such conduct. Accordingly, OCGA § 16-6-2 does not violate the right to privacy under the Georgia Constitution.

(b) Speech which advocates violation of the law is not protected " 'where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.' *Brandenburg v. Ohio*, 395 U. S. 444, 447 (89 SC 1827, 23 LE2d 430) (1969)." *State of Ga. v. Davis*, 246 Ga. 761, 762 (1) (272 SE2d 721) (1980). This is precisely the type of speech and conduct which are made illegal by the statute prohibiting the solicitation of sodomy. It is without dispute that defendant's words were " 'used in such circumstances and [were] of such a nature as to create a clear and present danger that they will bring about [a violation of the prohibition against sodomy].' " Id. quoting *Schenck v. United States*, 249 U. S. 47, 52 (39 SC 247, 63 LE 470) (1919). "[T]he commission of a felony is a substantive evil which our legislature has a right to prevent." *Davis*, supra at 762. Reasonable prohibitions against soliciting unlawful acts do not violate free speech rights. Because First Amendment protection does not extend to statements made in the solicitation of criminal acts, OCGA § 16-6-15 (a) does not reach protected speech.

3. We are certainly cognizant that numerous other states have decriminalized consensual sodomy. But the vast majority of those jurisdictions have done so by legislative repeal of their laws criminaliz-

---

determined that due process rights protected by the Fifth and Fourteenth Amendments to the federal constitution do not "extend a fundamental right to homosexuals to engage in acts of consensual sodomy. 478 U. S. at 192. The court also rejected the notion that, "any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription. . . ." 478 U. S. at 191.

[6] See *Barnes v. Glen Theatre*, 501 U. S. 560 (111 SC 2456, 115 LE2d 504) (1991), in which the protection of "societal order and morality" was identified as a "substantial government interest."

ing sodomy. While the duty of this Court is to "declare void any act of the legislature that offends the State Constitution," *IBM Corp. v. Evans*, 213 Ga. 333, 338 (99 SE2d 220) (1957), "before an act of a co-ordinate department of the government will be declared unconstitutional, the conflict between that act and the fundamental laws must be clear and palpable.' [Cits.]" *Blincoe v. State*, supra at 888. The right to determine what is harmful to health and morals or what is criminal to the public welfare belongs to the people through their elected representatives. We decline to usurp that which is the power of the legislature.

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., who concurs specially; Hines, J., who concurs in the judgment only; Sears and Hunstein, JJ., who dissent.*

FLETCHER, Presiding Justice, concurring specially.

Whatever the extent of the privacy rights under the Georgia Constitution of consenting adults in their homes, these rights do not protect solicitation of explicit sexual acts from total strangers in public rest areas. For this reason, I concur in the affirmance of Christensen's conviction under OCGA § 16-6-15 (a).

SEARS, Justice, dissenting.

Throughout history, the impulse of a majority to impose its moral judgments upon the rest of society often has resulted in laws that violate the fundamental tenets of our constitutional democracy. Among these tenets are the inalienable right to be left alone so long as one's private conduct does not interfere with the rights of others, and the right to speak freely. These two rights are embodied in the Georgia Constitution's Bill of Rights, which was conceived out of historical experience with tyranny, and stands as a bulwark protecting each citizen. Our body of constitutional law guarantees that the rights of privacy and free speech will not be violated by the State absent the most compelling of reasons. Today, a majority of this Court ignores these constitutional principles and evaluates the guaranteed rights of privacy and free speech under incorrect constitutional standards. Because I cannot sanction this corrosion of rights guaranteed to the citizens of this State, I respectfully dissent.

1. The facts of this case show that the Rockdale County Sheriff's Department was conducting an undercover operation at an interstate highway rest area. Their modus operandi was to approach men at the rest area, and engage them in conversation to see whether they would express an interest in sexual activity. Christensen was at the rest area, and was approached by an undercover officer. The officer began a conversation with Christensen, and asked him whether he was "looking for anything in particular." When Christensen failed to solicit the

officer for sex, the officer began to leave, at which time Christensen stated he was interested in engaging in oral sex. The officer suggested that the two men go to a nearby motel, where he had a room. When Christensen drove past the motel, he was arrested and charged with solicitation of sodomy, in violation of OCGA § 16-6-15 (a). There was never any suggestion that the proposed sexual activity between Christensen and the undercover officer would occur any place other than in the privacy of a motel room. The proposed sexual activity was to have occurred between two consenting adults. There was never any offer of or solicitation for money.

At trial, Christensen asserted his right of privacy under the Georgia Constitution in defense of the charge against him. The trial court rejected that constitutional argument by reasoning that the statutes criminalizing sodomy and the solicitation thereof are "based upon morality," and "reflect the . . . moral statement of the majority" of Georgia's citizens. According to the trial court, no "further justification" was required in order for Georgia's sodomy statutes "to be constitutional." The trial court also held that the citizens of Georgia, both heterosexual and homosexual, have "no fundamental right to engage in sodomy," because that act does not lead to procreation. As explained below, the trial court's analysis of the right to privacy guaranteed by our State Constitution exhibits a failure to comprehend fundamental constitutional principles, and is clearly erroneous.[7]

Today, a majority of this Court affirms the trial court's ruling by stating that the sodomy and solicitation of sodomy statutes "further . . . the moral welfare of the public." Like the trial court, the majority believes that Christensen's solicitation was immoral, and that in Georgia, what is beyond the pale of majoritarian morality also is beyond the limits of constitutional protection. If we lived in an autocracy, the majority would be correct. But such is not the case. We are privileged to live in a state that, as one of the original 13 colonies, was founded upon the most inspired, fundamental, and essential constitutional principles in the history of civilization. These constitutional principles are given effect by the protections guaranteed to our citizens under our State Constitution. Among these protections is an absolute and immutable right of privacy, which this Court has construed as one's right to be left alone, free from government intrusion, so long as one's conduct does not interfere with the rights of others. Further, our State Constitution guarantees that no state statute shall proscribe

---

[7] Both the trial court and the majority opinion have incorrectly considered Christensen's right to privacy argument in light of the often-criticized United States Supreme Court opinion in *Bowers v. Hardwick*, 478 U. S. 186 (106 SC 2841, 92 LE2d 140) (1986). As explained at n. 18 and accompanying text, the *Hardwick* opinion in no way dictates the limits of Georgia's constitutional right of privacy, and therefore provides no legitimate support for either ruling.

constitutionally protected speech.

This Court is sworn to uphold these hard-won constitutional protections in strict accordance with the principles established by our predecessors. Unfortunately, today the majority eviscerates the rights of privacy and free speech by applying the wrong constitutional standards to them, and by ignoring relevant precedent from this Court. For these reasons, I believe that the result of the majority opinion is pathetic and disgraceful, and has tragic implications for the constitutional rights of the citizens of this State.

2. Admittedly, many individuals, myself included, find the fact that this case involves the solicitation for sex between two complete strangers to be personally offensive. Nonetheless, it simply is not criminal to solicit that which is not illegal. If the underlying sodomy statute set forth in OCGA § 16-6-2 is unconstitutional, rendering the criminal prohibition against sodomy invalid, then the solicitation of sodomy statute found in OCGA § 16-6-15 (a) likewise is invalid. As explained, this Court has a duty to evaluate the constitutionality of Georgia's sodomy statutes in accordance with established criteria set forth by law. That duty is not dependent upon the existence of non-offensive factual circumstances. That this case involves personally offensive facts cannot dissuade us from fulfilling our duty to obey the Constitution.[8] To say that an act is entitled to constitutional protection in no way condones the act itself. Indeed, a great deal of behavior many find intolerable and even immoral is not subject to criminal prohibition under our constitutional system.

3. More than any other state in the nation, Georgia has been a pioneer in recognizing and defending the constitutional right of privacy. Georgia case law recognized a legally protected right of privacy based upon our State Constitution more than 60 years before the United States Supreme Court first took notice of the right of privacy under the federal constitution.[9] The Georgia Supreme Court was the first high court in the nation to declare that its citizens have an absolute and immutable right of privacy, which, above all else, accords

---

[8] See K. Gordon Murray Productions v. Floyd, 217 Ga. 784, 798 (125 SE2d 207) (1962) (according constitutional protection to offensive obscenity; "as trusted judges we have no alternative to saying, thus sayeth the Constitution, and we cheerfully obey."). Other state supreme courts have recognized their duty to look beyond personally offensive factual circumstances in striking down those states' sodomy statutes on constitutional right to privacy grounds. See, e.g., Commonwealth v. Wasson, 842 SW2d 487 (Ky. 1992) (involving public solicitation in a downtown Lexington parking area); People v. Onofre, 415 NE2d 936 (Ct. App. N.Y. 1980) (involving the commission of sexual acts in an automobile parked on a public street); Commonwealth v. Bonadio, 415 A2d 47 (Pa. 1980) (involving sexual acts committed on stage in an adult entertainment facility). See also Campbell v. Sundquist, No. 01A01-9507-CV-00321 (Tenn. Ct. App. Jan. 26, 1996).

[9] Pavesich v. New England Life Ins. Co., 122 Ga. 190 (50 SE 68) (1905); compare Griswold v. Connecticut, 381 U. S. 479 (85 SC 1678, 14 LE2d 510) (1965).

them "a legal right 'to be let alone,' so long as [they are] not interfering with the rights of other[s] or of the public."[10]

This Court has stated that the right to privacy is derived from both natural and Roman law, and is immutable — meaning that "no authority can either change or abolish [it]."[11] We also have instructed that the right to privacy is absolute — meaning that it is a right "which every [person] is entitled to enjoy, whether out of society or in it."[12] We have stated that the right of privacy is a component of the inalienable rights of personal security and personal liberty.[13] The former of these two rights, that of personal security, has been defined by this Court as a person's

> legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation . . . [and] a right to enjoy life in any way that may be most agreeable and pleasant to him, according to his temperament and nature, provided that in such enjoyment he does not invade the rights of his neighbor. . . ."[14]

As regards the right of personal liberty, this Court has said that it:

> [E]mbrace[s] the right of a [person] to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. Liberty includes the right to live as one will, so long as that will does not interfere with the rights of another or of the public. . . . Each is entitled to a liberty of choice as to his manner of life, and neither an individual nor the public has a right to arbitrarily take away from him his liberty.[15]

Georgia's right of privacy is firmly rooted in the due process clause found in Article I of our State Constitution,[16] and is fortified by the Constitution's special protection of our citizens' "freedom of conscience" and "inherent rights."[17] Because it is firmly established that the Georgia Constitution's due process clause accords Georgia citizens greater protections than does its federal counterpart, this

---

[10] *Pavesich*, 122 Ga. at 197.

[11] Id. at 194.

[12] Id.

[13] Id. at 195.

[14] Id.

[15] Id. at 195-196.

[16] See *Pavesich*, 122 Ga. at 197; *State of Ga. v. McAfee*, 259 Ga. 579, 580 (385 SE2d 651) (1989).

[17] Ga. Const., Art. I, Sec. I, Pars. III, XXVIII.

Court is in no way bound by federal case law on the constitutional issues involved in this appeal.[18] Accordingly, federal case law based upon a lesser standard of due process protection than that accorded under the Georgia Constitution, such as the *Hardwick* decision, provides no support for the majority opinion in this case.

The constitutional principles associated with the right to privacy leave no room for doubt that in Georgia, a citizen's private conduct is constitutionally protected from intrusion by the State so long as such conduct does not injure another. Put another way, the power of the State to regulate and control the private, consensual, non-commercial conduct of its adult citizens is confined only to those instances where such conduct adversely affects the rights of others. It simply is not within the authority of "a free government to invade the sanctity of the absolute rights of a citizen any further than the direct protection of society requires."[19] This was recognized as early as 1859 by the constitutional philosopher and scholar John Stuart Mill, who stated:

> The only part of the conduct of anyone for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign. . . . The principle requires liberty of taste and pursuits; of framing the plan of our life to suit our own character; of doing as we like, subject to such consequences as may follow; without impediment from our fellow creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong. . . . No society in which these liberties are not, on the whole, respected, is free, whatever may be its form of government. . . . The only freedom which deserves the name, is that of pursuing our own good in our own way, so long as we do not attempt to deprive others of theirs, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, or mental or spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves, than by compelling each other as seems good to the rest.[20]

---

[18] See *Green v. State*, 260 Ga. 625, 627 (398 SE2d 360) (1990), cert. denied, 500 U. S. 935 (111 SC 2059, 114 LE2d 464) (1991); *Denton v. Con-Way Southern Express*, 261 Ga. 41, 45 (402 SE2d 269) (1991), overruled on other grounds, *Grissom v. Gleason*, 262 Ga. 374 (418 SE2d 27) (1992); *Fields v. Rockdale County*, 785 F2d 1558, 1561 (11th Cir. 1986), cert. denied, 479 U. S. 984 (107 SC 571, 93 LE2d 575) (1986).

[19] *Wasson*, 842 SW2d at 494; see *Pavesich*, 122 Ga. at 195-196.

[20] John Stuart Mill, ON LIBERTY, 1859.

The constitutional imperatives identified by Mill are entirely consistent with the Georgia case law discussed above. Insofar as Georgia's citizens keep their conduct to themselves and do not interfere with the rights of others, the State has no legitimate concern. What some construe as immorality in private, that does not operate to the detriment of others, is beyond the reach of state action under the guarantees accorded Georgia's citizens by their Constitution, regardless of whether a majority believes such conduct to be "foolish, perverse, or wrong."[21] For a freedom that is permitted only so long as it is exercised in accordance with the will of a majority, even though such exercise does not interfere with the rights of others, is no freedom at all. Rather, it is a mark of despotism, and a step backward toward the majoritarian tyranny that our founders sought to escape.

4. As noted, the right of privacy does have a limit — it cannot entrench upon the rights of another or the public. The line of demarcation where one person's right to privacy ends and the rights of another begins is, admittedly, sometimes difficult to ascertain. But we have stated that merely because "the line where these [two] liberties impinge upon each other may in a given case be hard to define . . . [is] no . . . reason for denying to one his liberty of privacy."[22] We have cautioned that in defining this line, it must be remembered that "[p]rivacy . . . is not only essential to the welfare of the individual, but also to the well-being of society."[23] This much is beyond dispute — when the right to privacy is implicated by a state statute, as it is here, the State is required to produce nothing less than a compelling interest in that statute in order to override the privacy rights implicated.[24] The majority opinion, by applying the lesser "rational basis" test in evaluating Christensen's right to privacy claim, has erred by applying the wrong constitutional standard.[25] *Pavesich* also makes it clear that the compelling interest asserted by the State must be associated with protecting the rights of others.[26] The majority opinion also has erred by failing to consider this requirement.

The case law establishes that it is exceptionally difficult for the

---

[21] Mill, supra. See *Pavesich*, 122 Ga. at 195-196. See also *Campbell, Wasson, Onofre, Bonadio*, supra, n. 8.

[22] *Pavesich*, 122 Ga. at 200.

[23] Id. at 201.

[24] *Zant v. Prevatte*, 248 Ga. 832, 833-834 (286 SE2d 715) (1982) ("The State has not shown such a compelling interest . . . as would override [the constitutional right to privacy]"). *McAfee*, 259 Ga. at 580-581.

[25] See Op. at 476. *Blincoe v. State*, 231 Ga. 886 (204 SE2d 597) (1974), relied upon by the majority, does not address directly the constitutional right to privacy. Rather, it collectively addresses eight constitutional attacks on the criminalization of marijuana by stating that if the State had no legitimate purpose reasonably related to such criminalization, its exercise of the police power would be invalid. Id. 231 Ga. at 887.

[26] See notes 10, 14 and 15, supra, and accompanying text.

State to establish a compelling interest sufficient to overcome the right of privacy. For example, this Court has held that a state prisoner's "constitutional right to privacy" permits him to sustain a hunger strike in the face of impending death, despite the State's countervailing and "compelling . . . interest in preserving any human life."[27] Similarly, we have held that a Georgia citizen's "constitutional rights to privacy and liberty" prevented the State from "turn[ing] off his ventilator," and thereby ceasing life support systems and causing death.[28]

5. Since 1961, at least 31 states have abandoned criminal sanctions for adult, private, consensual, non-commercial sodomy; seven by judicial decree based primarily on constitutional right to privacy grounds.[29] Far from being on the edge of constitutional jurisprudence, the rulings of these other states' courts are "but part of a moving stream."[30] Even though these cases provide instruction for this Court's inquiry into Georgia's sodomy statutes, they are altogether ignored by the majority.

6. It is already established that the Georgia sodomy statutes implicate the constitutional right of privacy guaranteed to our citizens.[31] As explained, once the constitutional right to privacy is implicated, the State is required to come forth with a compelling interest in order to overcome that right, and to show that State action is necessary to protect the rights of others.[32]

The sole basis asserted by the State in support of its sodomy statutes is its moral interest in condemning acts of homosexual sod-

---

[27] *Zant*, 248 Ga. at 833-834.

[28] *McAfee*, 259 Ga. at 580.

[29] See, e.g., *Campbell v. Sundquist*, ____ SW2d ____ (Tenn. Ct. App., Jan. 26, 1996) ("[Tennessee] citizen's fundamental right to privacy ('the right to be let alone') encompasses the right of . . . [adult individuals of the same sex] to engage in consensual, private, non-commercial sexual conduct, because the activity involve[s] intimate questions of personal and family concern"); *Commonwealth v. Wasson*, 842 SW2d, supra at 498 (Kentucky's sodomy statute unconstitutionally "sacrifices personal liberty, not because the actor's conduct results in harm to another citizen but only because it is inconsistent with the majoritarian notion of acceptable behavior."); *Commonwealth v. Bonadio*, 415 A2d, supra at 50 (Pennsylvania sodomy statute "has only one possible purpose: to regulate the private conduct of consenting adults. . . . [This] exceeds the valid bounds of the police power while infringing the right to equal protection of the laws."); *People v. Onofre*, 415 NE2d, supra at 940 (New York's sodomy law impermissibly invades "the cloak of the right of privacy . . . in acts of sexual intimacy . . . voluntarily made by adults in a noncommercial, private setting."); *State v. Pilcher*, 242 NW2d 348 (Iowa 1976); *State v. Morales*, 826 SW2d 201 (Tex. App. 1992), rev'd on other grounds, 869 SW2d 941 (Tex. 1994); *State v. Ciuffini*, 395 A2d 904 (N.J. App. 1978). See also Model Penal Code & Commentaries, Part II, § 213.2 at 371-372 (1980).

[30] *Wasson*, 842 SW2d at 487.

[31] See *Stover v. State*, 256 Ga. 515, 516 (350 SE2d 577) (1986) (recognizing that the sodomy laws may impact privacy concerns "in private sexual activity"); *Macon-Bibb County Water &c. Auth. v. Reynolds*, 165 Ga. App. 348, 350 (299 SE2d 594) (1983) ("The right of privacy has been described as . . . the right to define one's circle of intimacy.").

[32] See notes 14, 15 and 24, supra, and accompanying text.

omy. In support of this argument, the State asserts that such acts are proscribed by Judeo-Christian values, and were punishable during the Middle Ages and Reformation. Succinctly stated, the State's position is that the majority has the right to criminalize sexual activity that it finds immoral, without regard to whether the activity is conducted in private between consenting adults and is not, in and of itself, harmful to others or the participants. The State recognizes this Court's authority to define "emerging rights under our [C]onstitution," but argues that those rights are valid only if they are in line with the "moral values" of a majority. Thus, the State believes that the moral indignation felt by the majority of society against the private sexual preference of some citizens justifies criminalizing those sexual activities. The State also argues that the decriminalization of sodomy would be harmful to society at large, as it would "lower the estate of marriage [and its associated intimacy] to merely another alternative lifestyle." The majority opinion agrees with these arguments, insofar as it rules that the sodomy statutes exist to further the "moral welfare of the public."

The State's arguments altogether fail to pass constitutional muster. The case law clearly shows that the constitutionality of a criminal statute is not established merely by alleging that it comports with the morals of a majority. For example, laws prohibiting interracial marriage were declared unconstitutional even though a majority believed that miscegenation was a moral offense with ancient roots.[33] Likewise, state laws banning the sale of contraceptives to minors were ruled unconstitutional despite the prevailing belief that such use of birth control devices was morally detrimental.[34] It is true that many issues involving moral questions are open to debate, and that there may be more than one valid opinion expressed within the context of such debate. Yet, it is the very definition of a constitutional right that it cannot be made wholly subject to the will of the majority.[35] In Georgia, as in the rest of the United States, no significant state interest can justify the legislation of norms simply because a particular belief is followed by a majority. By upholding the sodomy statutes on public morality grounds, the majority opinion makes the right to privacy

---

[33] See *Loving v. Virginia*, 388 U. S. 1 (87 SC 1817, 18 LE2d 1010) (1967); contra *Scott v. State*, 39 Ga. 321 (1869) (upholding Georgia's anti-miscegenation statute by stating that interracial marriages "are productive of evil, and evil only, without any corresponding good").

[34] See *Carey v. Population Svcs. Intl.*, 431 U. S. 678, 695 (97 SC 2010, 52 LE2d 675) (1977) (rejecting the argument that laws banning the sale of contraceptives to minors serves the moral good by discouraging early and extramarital sexual behavior).

[35] *West Virginia Bd. of Ed. v. Barnette*, 319 U. S. 624, 637-638 (63 SC 1178, 87 LE 1628) (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials. . . . One's right[s] . . . may not be submitted to vote; they depend on the outcome of no elections.").

wholly dependent upon majoritarian approval — a result that has absolutely no place whatsoever in constitutional jurisprudence.

As discussed above, this Court has twice ruled that the State's interest in preserving the lives of those who wish to die — an interest at least equally, if not more, compelling than the expression of moral indignation at private, consensual adult conduct — is not sufficiently compelling to outweigh the right to privacy.[36] Consequently, the only possible reasoned conclusion to be drawn is that the State's purported moral interest in the sodomy statutes is constitutionally insufficient to overcome the implicated privacy rights.

Nor has the State shown that unless the sodomy statutes are upheld, the rights of others will suffer. First, the State has made no showing that the underlying sodomy statute, when violated in private, has any impact whatsoever on the rights of others. Regarding the solicitation of sodomy statute, while I assume that a majority would prefer not to overhear solicitations such as the one in this case, there is no evidence whatsoever that Christensen's solicitation was heard by anyone other than the undercover officer, who actually invited the solicitation. Thus, it cannot be said that the solicitation of sodomy statute protected the officer's right to be free from unwanted solicitations. Moreover, anti-nuisance and harassment laws would adequately protect that right. Furthermore, the sodomy laws cannot be upheld as analogous to "victimless crimes," such as drug offenses and seatbelt requirements. Those laws were not enacted in order to enforce conventional morality, but rather because the party who becomes injured as a result of breaking those laws often becomes a burden on society.[37]

Furthermore, the record fails to show that a majority of Georgians believe that consensual, non-commercial, private acts of sodomy between consenting adults are immoral. In fact, the record may well indicate the complete opposite. This Court has received amici curiae briefs submitted by no fewer than 15 established religious organizations and ordained leaders within those organizations, all of whom assert that within the moral teachings of those organizations, the criminalization of sodomy cannot be justified as a reflection of public morality. The statement of the General Assembly of the United Pres-

---

[36] See notes 27 and 28, supra, and accompanying text.

[37] See *Wasson*, 842 SW2d at 497 (citing Lord Lloyd, *Introduction to Jurisprudence*, p. 59 (4th ed. 1979)). Moreover, we have previously held that statutes prohibiting much more blatant communications, which are thrust in the public eye and impossible to ignore, cannot be justified by an alleged interest in protecting the sensibilities of minors or others. See *Cunningham v. State*, 260 Ga. 827, 831 (400 SE2d 916) (1991) (statute prohibiting profane words on bumper stickers cannot be justified by desire to protect the public's sensibilities, and violates free speech); *Coleman v. Bradford*, 238 Ga. 505 (233 SE2d 764) (1977) (desire to protect public from non obscene "trashy" films insufficient to override free expression rights).

byterian Church is illustrative of the position of these organizations:

> There is no legal, social, or moral justification for denying homosexual persons access to the basic requirements of human social existence. Society does have a legitimate role in regulating some sexual conduct, for criminal law properly functions to preserve public order and decency and to protect citizens from public offense, personal injury, and exploitation. Thus, criminal law properly prohibits homosexual and heterosexual acts of rape, coercion, corruption of minors, mercenary exploitation, or public display. However, homosexual and heterosexual acts in private between consenting adults involve none of these legitimate interests of society. Sexual conduct in private between consenting adults is a matter of private morality to be instructed by religious precept or ethical example and persuasion, rather than by legal coercion.[38]

Accordingly, it is evident that the State has failed to consider the sentiments of all of its citizens before asserting that its sodomy statutes reflect the moral will of the people.

Finally, the State's nebulous argument that the sodomy laws protect the institution of marriage borders upon the specious, and is not supported by any evidence whatsoever. It also bears emphasizing that declaring the sodomy statutes to be unconstitutional will have no effect upon the State's legitimate interest in criminalizing other sexual acts which do inflict harm upon the rights of others. Crimes such as rape, incest, the sexual exploitation of children, prostitution, public indecency, and sexual battery all serve to protect others and are supported by compelling State interests, and therefore would not be impacted in any way by declaring the state sodomy statutes unconstitutional.

To conclude, the State has failed to show either that its sodomy statutes serve a compelling interest or that the statutes are necessary to protect the rights of others. For its part, the majority opinion has failed to even recognize that the State must make these showings. What the State and the majority opinion both have failed to comprehend is that there is no right for a majority to impose its moral sensi-

---

[38] General Assembly of the United Presbyterian Church, Policy Statement and Recommendation on the Church and Homosexuality (1978). Other religious organizations represented in the amici briefs include: the Episcopal Church, the United Church of Christ, the Unitarian Universalist Association, the Baptist Peace Fellowship of North America, the Brethren Mennonite Council, the Unitarian Universalist Congregation, Congregation Bet Haverim, the Atlanta Friends Meeting (the Quakers); Dignity USA; and The Fellowship of Metropolitan Community Churches.

bilities upon all of the people, absent compelling evidence that unless those sensibilities are imposed universally, all will suffer.

7. The sodomy statutes also violate the rights of free expression guaranteed under the State Constitution. The solicitation of sodomy statute is facially overbroad as it infringes upon the rights of all adults to even discuss engaging in private, consensual, non-commercial activity that is protected under both the state and federal rights to privacy. In this regard, it must be noted that under the majority opinion, all conversations regarding certain private conduct are subject to State intrusion and potentially punishable as crimes — including a husband's whisper into his wife's ear on their anniversary, a young couple's dialogue during their first night together, and a frank discussion between lifelong partners concerning their sex life.

A statute regulating speech will be struck down as overbroad when it proscribes, or can proscribe, constitutionally protected conduct or speech.[39] The solicitation of sodomy statute is content-based, as it criminalizes speech in which one suggests sodomy. A content-based statute must be examined to determine whether it affects protected speech. If so, it is then examined to see whether it is narrowly tailored to serve a vital government interest.[40] Criminal statutes must be especially carefully examined.[41] "Before considering whether a statute is over broad, we must determine 'if it reaches a substantial amount of constitutionally protected conduct.' "[42] Once it is determined that a statute is overbroad, it must be determined whether it is subject to a narrowing construction by the court.[43]

The solicitation of sodomy statute prohibits all discussions about engaging in private, non-commercial acts of sodomy between consenting adults, whether heterosexual or homosexual, married or single.[44] However, the State has expressly admitted that the sodomy statutes are unconstitutional under the United States Constitution as applied to married heterosexual couples.[45] Hence, it is clear that, under the State's own admission, the solicitation of sodomy statute, which proscribes the discussion of consensual acts of sodomy between

---

[39] See *Sabel v. State*, 248 Ga. 10, 13 (282 SE2d 61), cert. denied, 454 U. S. 973 (102 SC 524, 70 LE2d 393) (1981), overruled on other grounds, *Rower v. State*, 264 Ga. 323 (443 SE2d 839) (1994); *State of Ga. v. Davis*, 246 Ga. 761, 762 (272 SE2d 721) (1980).

[40] *Cunningham*, 260 Ga. at 831.

[41] Id.

[42] Id. (citation omitted).

[43] Id.

[44] OCGA §§ 16-6-2; 16-6-15 (a).

[45] See *Landmark Briefs and Arguments of the Supreme Court of the United States: Constitutional Law: 1985 Term Supplement*, B. Kurland and G. Casper, Editors, Vol. 164 at 636 (University Pub. of America 1987); *Hardwick*, 478 U. S. at 218, n. 10 (Stevens, J., dissenting). See also *Mosley v. State*, No. 89-6897-1 (DeKalb County Superior Court Sept. 6, 1989). `

consenting, married heterosexual adults, "reaches a substantial amount of constitutionally protected conduct," thereby rendering it overbroad.[46] Nor is there any narrowing construction of the statute available that can comport with its overbroad and all-inclusive language. Accordingly, the sodomy statutes clearly impinge upon constitutionally protected speech and conduct, and therefore are unconstitutional.

The majority opinion's analysis is also flawed in its application of the "clear and present danger" doctrine to the solicitation of sodomy. That doctrine applies only to words "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action."[47] In each case, the issue is one of the degree of the perceived danger — " 'the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary.' "[48] The clear and present danger doctrine does not apply to abstract or suggestive words, such as exist in this case.[49]

The clear and present danger doctrine has never been applied to situations where a verbal solicitation is punishable as a mere misdemeanor, nor does the majority cite any precedent for that proposition. Under the majority's analysis, a statute prohibiting one from soliciting exceeding the speed limit would be valid, because it would prevent a "clear and present danger" that the Motor Vehicle Code would be violated. In that instance, citizens could be arrested for telling their traveling companions to "hurry up," lest they be late for an engagement.

8. In the long history of human governance, the advent of democracy marked a major moral advance because of its recognition of the inherent dignity of the individual, and the worth of his private life. The underlying idea that the individual has a right to rule himself in both private and public affairs was a monumental challenge to the many authoritarian conceptions of government that preceded democracy. Quite consciously, then, this country's original social contract with its citizens recognized and gave credence to our immense variety of personal tastes and values, and granted to each citizen the right to pursue his or her own conception of the good. Under the unique

---

[46] *Cunningham,* supra. In accordance with my opinion expressed in Division 6 above, I would also rule that the statute is overbroad insofar as it proscribes discussions of consensual acts which do not impinge upon the rights of others, and are therefore unconstitutional.

[47] *Brandenburg v. Ohio,* 395 U. S. 444, 447 (89 SC 1827, 23 LE2d 430) (1969); see *Cunningham,* 260 Ga. at 828 (clear and present danger doctrine applies only to words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace").

[48] *Dennis v. United States,* 341 U. S. 494, 510 (71 SC 857, 95 LE 1137) (1951).

[49] See *Brandenburg,* 395 U. S. at 448; *Schenck v. United States,* 249 U. S. 47, 52 (39 SC 247, 63 LE 470) (1919); see also L. Tribe, *American Constitutional Law,* § 12-9 at 848-849 (2nd ed. 1988).

American democratic scheme, government was intended to play a relatively insignificant role in the individual's pursuit of the good.

To ensure the preservation of this social contract between our government and its citizens, and in order to limit the State's ability to intrude into the individual's private realm, we developed a group of rights defined by a constitution, and a judicial system charged with being the vigorous and independent guardian of those rights. In upholding those rights, and thereby allowing our governmental scheme to flourish, it is imperative that we look past our differences, refuse to abdicate our character, and resist succumbing to those who would have us renounce our constitutional foundations in favor of assertions of exclusive moral superiority and entitlement. To do any less imperils our future.

In sum, because I believe that the majority of this Court today would relinquish its guardianship of this state's citizen's rights of privacy and free speech, I respectfully yet resolutely dissent.

HUNSTEIN, Justice, dissenting.

I respectfully dissent to the majority opinion because I do not agree that the "moral welfare of the public" presents a compelling reason that outweighs the constitutional right of privacy possessed by all individuals in this state.

It is well-established law in this state that the right of privacy is guaranteed to all persons in this state by the Georgia Constitution, *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 197 (50 SE 68) (1905), and that this right cannot be overridden by anything short of a compelling state interest. *Zant v. Prevatte*, 248 Ga. 832, 834 (286 SE2d 715) (1982). While I cannot concur with all that is said by Justice Sears in her dissent, I agree with her that the majority opinion has incorrectly applied the lesser "rational basis" test and that when the proper test is applied to the facts in this case, this Court must conclude that the sodomy statute in issue here is unconstitutional.[50]

Georgia's sodomy statute applies, without exception or reservation, to all of those consenting adults who freely and voluntarily engage in private in certain specified sexual conduct, including heterosexual, married couples.[51] *Any* person who engages in "any sexual act involving the sex organs of one person and the mouth or anus of another," OCGA § 16-6-2 (a), commits a crime that "shall be punished by imprisonment for not less than one nor more than 20 years." Id. at

---

[50] A ruling that the sodomy statute, OCGA § 16-6-2, is unconstitutional necessarily means that OCGA § 16-6-15 (a), which criminalizes the solicitation of sodomy, is likewise invalid.

[51] There is no question here of the involvement by minors in the prohibited conduct; there is no issue of money or goods being exchanged for engaging in the prohibited conduct; there are no public displays of indecency involved.

(b). Those who engage in sodomy are criminals, whether they are a heterosexual couple married to each other[52] or strangers of the same sex who first meet at a rest stop and then proceed to a motel room. The majority upholds a statute that applies to *all* individuals in this state on the basis that it furthers the "moral welfare of the public."[53] I cannot agree with the majority's conclusion that the "moral welfare of the public" requires this Court to uphold a statute that criminalizes all private, consensual sodomy.

Finally, although not presenting constitutional grounds for striking down the sodomy statute, I would find OCGA § 16-6-2 invalid because criminal statutes like it, which are defined based upon the body parts involved during private consensual sex, which are ignored and ridiculed by the populace, and which are enforced with discriminatory selectivity, can only breed contempt and foster disdain and disrespect for the law, the State, and the law enforcement community.

DECIDED MARCH 11, 1996 —
RECONSIDERATION DENIED MARCH 28, 1996.

*Gerald R. Weber, Bondurant, Mixson & Elmore, Jane E. Fahey, Doffermyre, Shields, Canfield & Knowles, Ralph I. Knowles, Jr.,* for appellant.

*Cheryl F. Custer, District Attorney, Michael M. Hawkins, Assistant District Attorney, Michael J. Bowers, Attorney General, Michael E. Hobbs, Senior Assistant Attorney General,* for appellee.

*Milner S. Ball, Harry H. Harkins, Jr., Jane Morrison, Kirwan, Parks, Chesin & Remar, Robert B. Remar, Susan M. Garrett,* amici curiae.

---

[52] It appears from the history of the sodomy statute that the current language of the statute was enacted for the specific purpose of criminalizing sodomy committed by heterosexuals. See *Bowers v. Hardwick*, 478 U. S. 186, 201, n. 1 (106 SC 2841, 92 LE2d 140) (1986) (Blackmun, J., dissenting).

[53] The State argues this Court cannot reach the issue of the application of OCGA § 16-6-2 to heterosexual couples because defendant does not have standing to raise that issue having been charged only with "homosexual sodomy." There is no distinction between "homosexual" and "heterosexual" sodomy in the Georgia Criminal Code and the State's argument must fail accordingly.