44550.  BODREY v. CAPE et al.

SUBMITTED JUNE 4, 1969—DECIDED DECEMBER 5, 1969—
REHEARING DENIED DECEMBER 19, 1969—

860

*Guy V. Roberts, Jr.,* for appellant.

*Luther U. Bloodworth, T. Coleman Bloodworth, J. Alton Gladin,* for appellees.

JORDAN, Presiding Judge. ■ There is the preliminary question of whether the transcript of evidence from the habeas corpus matter could properly be considered in this action on plaintiff's motion for summary judgment. The trial judge, in denying plaintiff's motion, made no reference to what he considered in making his determination.

On motion for summary judgment "[t]he court is authorized to examine proffered materials extraneous to the pleadings, not for the purpose of trying an issue, but to determine whether there is a genuine issue of material fact to be tried." 6 Moore's Federal Practice § 56.04 [1], p. 2060. Such extraneous matter most often consists of depositions, answers to interrogatories, admissions on file and affidavits, if any. Also among that which may be considered is oral testimony, judicial notice, presumptions, stipulations, concessions of counsel, certified transcript

of a court, exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence or useable at trial. See 6 Moore's Federal Practice §§ 56.11[1.-6]—56.11 [1.-8], pp. 2147-2149.

It has been said that "a certified transcript of a court record is better evidence of its contents than an affidavit with regard thereto." Fletcher v. Bryan, 175 F2d 716, 717 (CA4th 1949). Also see Steven v. Roscoe Turner Aeronautical Corp., 324 F2d 157, 162 (CA7th 1963); Shulins v. New England Ins. Co., 360 F2d 781, 785 (CA7th 1963). In the case of Ramsouer v. Midland Valley R. Co., 135 F2d 101 (CA8th 1943) the plaintiff was suing for damages for the death of her husband. The defendant moved for summary judgment based on the record of oral testimony taken and offered in a prior case. Such prior case was one brought by the same plaintiff against the same defendant on the same cause of action, but which she had dismissed without prejudice. The trial court considered the former testimony and granted the defendant's motion for summary judgment. On appeal the appellate court also considered the former testimony in determining the propriety of the trial court's conclusion, noting that a court's duty on summary judgment was not to decide any issue of fact but merely to ascertain, from what was presented, whether there was any issue to be decided.

Thus, on the basis of the above cited cases, and on the basis that a transcript of previously sworn to testimony is of equal dignity with a deposition, and on the basis that testimony given under laboratory conditions, i.e., the courtroom itself, must be accorded reliability, we have concluded in this case that the testimony contained in the certified transcript of the previous habeas corpus proceeding, insofar as such testimony may be relevant and material to the present proceeding, is subject to *examination* by the court in carrying out its duty on summary judgment.

■ We now proceed with an examination of all the material before the court on the motion. In the habeas corpus proceeding, Charles Willie Bodrey testified that:

"Finally, in September, Jimmy Lewis and I watched Jean's

house. We concealed ourselves in some trees and in the out-buildings around the house. Jean and Clarence [Clarence R. Bodrey is defendant's father] came out of the house and sat down on the back steps and began hugging and kissing. Russ came to the back door and Jean scolded Russ and made him go back into the house. Clarence and Jean became suspicious as it was thundering and lightning, and the dogs were barking.

"I have watched Clarence and Jean's house 20 times or more, all at night, whenever Clarence is at home they get together. . . .

"On September 26, 1967, Randall Matthews and I concealed ourselves a short distance from Jean's house at about 7 or 8 p.m. Shortly thereafter, Clarence came in and walked up to Jean's house and went in. We left about 3:30 a.m. and Clarence was still in Jean's house with all the light off. . .

"December 1, 1967, Randall Matthews and I went out to Jean's house, concealed my car and hid ourselves in front of the house. Clarence came to Jean's house at about 7:10 and one of his farm hands took his truck and drove off. About 7:30 Jean and Clarence came out of Jean's house, got in her car and drove to Clarence's house. They got out, went in his house, and turned on the light, stayed about 12 minutes, and returned to Jean's house. About 9 all the lights went off in Jean's house. Randall watched until 7 a.m. I went back and forth all night checking on Randall. They were still together at 7 a.m. when we left.

"On December 2, 1967, Charles Cape, Randall Matthews, Larry Bullock and I passed Jean's house about 6:30 p.m. Clarence was getting out of his truck. He went into Jean's house. I put Charles Cape, Randall Matthews and Larry Bullock out, they walked back and laid down in front of the house. I parked my car at my grandmother's house about a mile away and walked back where the other boys were. Clarence and Jean came out of her house about 8 p.m., got in Clarence's truck, did not turn on any lights on the truck, and drove down to Clarence's house without turning on any lights. We watched until about 2 a.m. It was raining so we had to leave, but Clarence and Jean were still in Clarence's house. We could see clearly because the

carport lights burn every night, and security lights at both houses. . ."

In defendant Bodrey's answer to the plaintiff's complaint, by way of further answer, he stated:

."The defendant shows that he became so concerned for the welfare of his minor son and in order to protect his minor son, he and Jimmy Lewis went to a place near the home of the plaintiff in early September, 1967, so that he could observe the activities and conduct of the plaintiff. The defendant further shows that on September 26, 1967, he and the defendant Wilbur Randall Matthews, went to a place a short distance from the plaintiff's house in order to observe the plaintiff's conduct and activities. The defendant, Charles Willie Bodrey, shows that on December 1, 1967, he and the defendant Wilbur Randall Matthews, went to a place near the plaintiff's home in order that they might observe the conduct and the activities of the plaintiff, and the defendant, Charles Willie Bodrey, shows that on December 2, 1967, he and the defendants, Charles Cape, Wilbur Randall Matthews, and Larry Bullock, went to a place near the plaintiff's home so that they could observe the plaintiff's conduct and activities. The defendant says that on each of these occasions he and the witnesses went to the places indicated for the purpose of observing the plaintiff's conduct and to determine if the reports that had been made to him were true. . .

"Further answering, the defendant shows that the plaintiff and Clarence R. Bodrey have associated together publicly all over Crisp County, Georgia, and the defendant shows that Clarence R. Bodrey has supported the plaintiff and given her lavish gifts. The defendant shows that Clarence R. Bodrey paid an indebtedness in the amount $2,000 which the plaintiff owed on her furniture and paid her property taxes of the year 1967, and bought her a brand new Chevrolet automobile for approximately $3,900. The defendant shows that because of this conduct on the part of the plaintiff and because of her illicit and clandestine relationship with Clarence R. Bodrey, he was compelled to observe the plaintiff's conduct in order that he might obtain information and secure the necessary evidence to take appropriate legal action against his wife and thereby protect and insure the health and welfare of his minor child. . .

"Defendant shows that under the laws of Georgia it is the duty of the father to protect his children, and if this defendant was a trespasser, which he denies, he was an innocent trespasser and all he did was done in the utmost good faith and with no other motive than to remove his son from these immoral places and conditions and to protect the welfare of his son. . ."

In an affidavit filed by defendant Charles Willie Bodrey, in opposition to plaintiff's motion for summary judgment, he states:

"Deponent further says that the lewd activities of his ex-wife and his father became so brazen and generally known by the public that many reports came to him from friends and neighbors concerning this illicit relationship, and the disastrous effect it was having upon his minor child, and that in order to protect his minor son, several times during September, 1967, to December 2, 1967, he, together with Jimmie Lewis, Charles Cape, Wilbur Randall Matthews, and Larry Bullock, who accompanied him at his request, investigated the activities and conduct of his ex-wife and Clarence Bodrey, and that on each of the occasions above described, deponent observed and saw with his own eyes that Clarence Bodrey and his ex-wife spent the night together either in the home of Clarence Bodrey or that of his ex-wife, which was within 75 yards of the home of each other. . .

"Deponent further says that all of his investigations and activities were done in the utmost good faith and for the sole purpose of protecting the physical, mental and spiritual welfare of his minor son, and to remove him from the immoral conditions existing in the homes of Clarence Bodrey and Martha Jean Bodrey, and that if he was a trespasser, which he denies, he was an innocent trespasser. . ."

We have reviewed the testimony of defendants Cape, Matthews, and Bullock, who were witnesses at the habeas corpus proceeding. It does not vary from that of defendant Bodrey, which has previously been set forth, with regard to the respective occasions on which he said they had accompanied him, nor does it vary with regard to the respective activities to which Bodrey testified that each of these persons had undertaken with

him on those occasions. It would serve no useful purpose to repeat their respective testimony.

Cape, in answering the plaintiff's complaint, further answered by stating that he is the plaintiff's brother and the brother-in-law of defendant Charles Willie Bodrey; that he became vitally concerned about the conduct of his sister and also was vitally concerned as to the welfare of his nephew (Russ). He states that he went with the other defendants on the night of December 2 and the morning of December 3, 1967, to a place a short distance from the plaintiff's house in order that he might observe the plaintiff's conduct and activities; that his act of going near the plaintiff's home to observe her conduct and activities was done in good faith because of his concern for his nephew and his deep concern about his sister's misconduct with Clarence R. Bodrey.

The answers and affidavits of Matthews and Bullock are similar, saying that their acts in going about plaintiff's premises on the night of December 2, and early morning of December 3, were done in the utmost good faith to assist Charles Willie Bodrey in his investigation of his former wife's activities, and that if they were trespassers, which they deny, they were innocent trespassers, and what they did was for the purpose of protecting and promoting the welfare and best interest of the minor child, Russell Bodrey.

An examination of the evidence presented by the plaintiff and by the defendants discloses that none of the defendants deny, rather they all affirm, observing the plaintiff's activities with the particular view of ascertaining the nature of her relationship with Clarence R. Bodrey; and that they did so by hiding around her home and the home of Clarence R. Bodrey at times under cover of darkness and from there observing them and the times and the nature of their meetings.

There is a right of privacy recognized in this state. It existed at common law and is said to be derived from the natural law, the right "to be let alone." Justice Cobb, speaking for our Supreme Court, pioneered in this field in *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190 (50 SE 68, 69 LRA 101, 106 ASR 104, 2 AC 561), where he said at p. 194: "The right of privacy

has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence. Any person whose intellect is in a normal condition recognizes at once that as to each individual member of society there are matters private and there are matters public so far as the individual is concerned. Each individual as instinctively resents any encroachment by the public upon his rights which are of a private nature as he does the withdrawal of those of his rights which are of a public nature."

Some of the common methods of invading one's privacy, because they are so scurrilous and so opprobrious, are prohibited by statute and made criminal conduct. It is a felony for "any person to go on or about the premises of another or any private place for the purpose of invading the privacy of another by eavesdropping upon their conversations or secretly observing their activities." *Code Ann.* § 26-2002 (c) (Ga. L. 1967, pp. 844, 846).

However, the law recognizes that the right of privacy is not absolute. Going back to *Pavesich,* supra, we find this language at page 201: "But it [right of privacy] must be kept within its proper limits, and in its exercise must be made to accord with the rights of those who have other liberties, *as well as the rights of any person who may be properly interested in the matters which are claimed to be of purely private concern."* (Emphasis supplied.) Again at page 199, "The right of privacy, however, like every other right that rests in the individual, may be waived by him . . . this waiver may be express or implied. . ."

We recognized these principles in *Pinkerton Nat. Detective Agency v. Stevens,* 108 Ga. App. 159 (2c) (132 SE2d 119) where this court said "The right of privacy may be implicitly waived and it is waived by one who files an action for damages resulting from a tort to the extent of the defendant's intervening right to investigate and ascertain for himself the true state of injury," the court going on to hold that the reasonableness of the investigation under the circumstances in that case was a question for the jury. If such waiver implicitly exists between parties involved in a tort action, why should it not be implied

between the parties to a court decree involving the important right of custody of a child of such parties?

A parent deprived of the custody of a child not only has a moral and human right but indeed a legal right to investigate and ascertain the conditions under which that child is being cared for. The law gives such parent a remedy in the event there has been a material change in circumstances which affect the welfare of the child. The superior court has continuing jurisdiction of the subject matter as it relates to custody of children and a different award may be entered in a proper proceeding when such change is shown to the court. *Mallette v. Mallette,* 220 Ga. 401 (3) (139 SE2d 322); *Ponder v. Ponder,* 198 Ga. 781 (3) (32 SE2d 801); *Madison v. Montgomery,* 206 Ga. 199 (1) (56 SE2d 292); *Perry v. Perry,* 212 Ga. 668 (95 SE2d 2).

One such material change can involve the conduct or misconduct of the parties. This requires the presentation of evidence. The defendant here, on the basis of the evidence obtained by observing the conduct of his ex-wife, brought an action seeking custody of his minor son. Based on such evidence of the plaintiff's conduct, unobjected to by her in that proceeding, the defendant was awarded custody of his son by the trial court. Affirmed on appeal. *Bodrey v. Bodrey,* 224 Ga. 348, supra.

Since the father of this child had such a vital and continuing interest and right in the welfare of his son, it cannot be said as a matter of law that he incurs liability for invasion of privacy for making observations and investigation into the affairs and conduct of his former wife who at the time had custody of his child. Under such circumstances there is an implied waiver of her right of privacy as to these defendants only, the ex-husband and those acting as his agents and under his direction. The reasonableness of the defendants' actions under all the circumstances is a question for the jury. Whether or not there was actual trespass is in dispute. These issue should be decided by a jury and the trial court properly denied the plaintiff's motion for summary judgment on the issue of liability.

*Judgment affirmed. Bell, C. J., Hall, P. J., Eberhardt, Deen, Quillian and Whitman, JJ., concur. Pannell, J., dissents. Evans, J., did not participate.*

PANNELL, Judge, dissenting. I must dissent from the final conclusions reached in Division 2 of the opinion. There was no waiver of the right of privacy here prior to the institution of the habeas corpus action by the father of the child, a defendant here. While the superior court, as stated in the majority opinion, has continuing jurisdiction "of the subject matter" as it relates to the custody of children, and a different award of custody may be made *upon a petition therefor* and upon a showing of a change in circumstances, no such situation exists here. The decree awarding the custody to the mother and plaintiff was final between the parties until a *new case* was filed showing a change of condition. Accordingly, there was no waiver on the part of the plaintiff prior to the habeas corpus action brought by the defendant father.

However, even should I assume, for the purpose of argument only, that all of the acts committed were done pending the habeas corpus case, I would still be unable to concur with the majority. The spying activities here were done mostly at night and in secret and at times upon the premises of the plaintiff. This type of activity is a crime under the criminal statutes of this State, which prohibit any person going upon or about the premises of another or any private place for the purpose of invading the privacy of another by eavesdropping *or secretly observing his activities.* Code § 26-2002 (c) (Ga. L. 1967, pp. 844, 846; *Code Ann.* § 26-2002 (c)). The plaintiff here, even under the rules which the majority apply, is not privileged to waive a violation of the criminal laws of this State. What was carried on here was not a reasonable investigation, but a criminal act under the laws of this State.

If the majority be correct, then in every case of a divorce or separation where there is a final decree granting custody of children to one of the parties, both parties (because of the "continuing jurisdiction") are given a license to secretly and clandestinely spy upon each other, either for the purpose of proving the one having custody is unfit (for the purpose of bringing a future action) or for the purpose of proving the one not having custody is unfit to be granted custody in case of future litigation on the subject.