## S98A0755. POWELL v. THE STATE.
(510 SE2d 18)

BENHAM, Chief Justice.

Anthony San Juan Powell was charged in an indictment with rape and aggravated sodomy in connection with sexual conduct involving him and his wife's 17-year-old niece in Powell's apartment. The niece testified that appellant had sexual intercourse with her and engaged in an act of cunnilingus without her consent and against her will. Powell testified and admitted he performed the acts with the consent of the complainant. In light of Powell's testimony, the trial court included in its jury charge instructions on the law of sodomy. The jury acquitted Powell of the rape and aggravated sodomy charges and found him guilty of sodomy, thereby establishing that the State did not prove beyond a reasonable doubt that the act was committed "with force and against the will" of the niece. See OCGA § 16-6-2 (a). Powell brings this appeal contending the statute criminalizing acts of sodomy committed by adults without force in private is an unconstitutional intrusion on the right of privacy guaranteed him by the Georgia Constitution. Powell also contends that the trial court erred when it offered the jury the opportunity to consider the unindicted charge of sodomy by sua sponte instructing the jury on the law of sodomy.

1. In keeping with the well-established principle that this Court will not decide a constitutional question if the appeal can be decided

upon other grounds (*Bd. of Tax Assessors v. Tom's Foods*, 264 Ga. 309, 310 (444 SE2d 771) (1994)), we first address the non-constitutional issues raised by the appeal. The first issue is the sufficiency of the evidence. OCGA § 16-6-2 (a) defines sodomy as the performance of or submission to "any sexual act involving the sex organs of one person and the mouth or anus of another." Appellant's admission at trial that he placed his mouth upon the genitalia of his wife's niece, as well as the niece's testimony similarly describing appellant's conduct, constitutes sufficient evidence to authorize a rational trier of fact to conclude beyond a reasonable doubt that appellant committed sodomy. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Carter v. State*, 122 Ga. App. 21 (4) (176 SE2d 238) (1970), overruled on other grounds in *Hines v. State*, 173 Ga. App. 657 (2) (327 SE2d 786) (1985).

2. Appellant next contends that the trial court erred when, without request by the State or appellant, it instructed the jury on the law of sodomy and permitted the factfinder to return a verdict on that included charge.

In *State v. Stonaker*, 236 Ga. 1, 2 (222 SE2d 354) (1976), this Court set forth rules "to clarify for the trial courts what must be charged and what may be charged and what need not be charged in the area of lesser included crimes in criminal trials." The second rule stated that the trial court could, "of [its] own volition and in [its] discretion, charge on a lesser crime of that included in the indictment and accusation." Id.; *Rodriguez v. State*, 211 Ga. App. 256 (2) (439 SE2d 510) (1993). Thus, when the evidence authorizes a charge on an offense included in the offense for which the defendant is being tried, the trial court is authorized to instruct the jury on the included offense sua sponte. *Alford v. State*, 200 Ga. App. 483, 484 (408 SE2d 497) (1991). Sodomy is an offense included in the crime of aggravated sodomy (*Stover v. State*, 256 Ga. 515 (2) (350 SE2d 577) (1986)), and the evidence summarized in Division 1 authorized a charge on the law of sodomy as an included offense. Accordingly, the trial court acted within the *Stonaker* framework when it exercised its discretion and instructed the jury on the included offense of sodomy.

3. Lastly, we address appellant's constitutional challenge to OCGA § 16-6-2 (a). In so doing, we are mindful that a solemn act of the General Assembly carries with it a presumption of constitutionality that is overturned only when it is established that the legislation "manifestly infringes upon a constitutional provision or violates the rights of the people. . . . [Cit.]" *Miller v. State*, 266 Ga. 850 (2) (472 SE2d 74) (1996). Appellant contends that the statute criminalizing intimate sexual acts performed by adults in private and without force impermissibly infringes upon the right of privacy guaranteed

all Georgia citizens by the Georgia Constitution.[1]

The right of privacy has a long and distinguished history in Georgia. In 1905, this Court expressly recognized that Georgia citizens have a "liberty of privacy" guaranteed by the Georgia constitutional provision which declares that no person shall be deprived of liberty except by due process of law. *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 197 (50 SE 68) (1905). The *Pavesich* decision constituted the first time any court of last resort in this country recognized the right of privacy (Katz, *The History of the Georgia Bill of Rights*, 3 GSU L. Rev. 83, 118 (1986); *Gouldman-Taber Pontiac v. Zerbst*, 213 Ga. 682 (100 SE2d 881) (1957)), making this Court a pioneer in the realm of the right of privacy. *Bodrey v. Cape*, 120 Ga. App. 859, 866 (172 SE2d 643) (1969). See also *Cox Broadcasting Corp. v. Cohn*, 231 Ga. 60 (200 SE2d 127) (1973), rev'd 420 U. S. 469 (95 SC 1029, 43 LE2d 328) (1975), where this Court proudly noted that the right of privacy "was birthed by this court" in *Pavesich*. Since that time, the Georgia courts have developed a rich appellate jurisprudence in the right of privacy which recognizes the right of privacy as a fundamental constitutional right, "having a value so essential to individual liberty in our society that [its] infringement merits careful scrutiny by the courts." *Ambles v. State*, 259 Ga. 406 (2) (b) (383 SE2d 555) (1989).

In *Pavesich*, the Court found the right of privacy to be "ancient law," with "its foundation in the instincts of nature[,]" derived from "the Roman's conception of justice" and natural law, making it immutable and absolute. Id. at 194. The Court described the liberty interest derived from natural law as "embrac[ing] the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common good." Id. at 195. "Liberty" includes "the right to live as one will, so long as that will does not interfere with the rights of another or of the public" (id. at 196), and the individual is "entitled to a liberty of choice as to his manner of life, and neither an individual nor the public has the right to arbitrarily take away from him his liberty." Id. at 197. The *Pavesich* Court further recognized that the

---

[1] Privacy rights protected by the U. S. Constitution are not at issue in this case. Thus, not applicable to this discussion are *Bowers v. Hardwick*, 478 U. S. 186, 191-192 (106 SC 2841, 92 LE2d 140) (1986), where the U. S. Supreme Court ruled that the right of privacy protected by the U. S. Constitution did not insulate private sexual conduct between consenting homosexual adults from state proscription because the U. S. Constitution did not "extend a fundamental right to homosexuals to engage in acts of consensual sodomy"[;] and *King v. State*, 265 Ga. 440 (458 SE2d 98) (1995), where this Court was faced with a defendant's assertion of the federal right of privacy. See also *Katz v. United States*, 389 U. S. 347, 350-351 (88 SC 507, 19 LE2d 576) (1967), where the Court opined that the protection of a person's general right to privacy, i.e., the right to be left alone, was left largely to the individual States.

"right of personal liberty" also embraces "[t]he right to withdraw from the public gaze at such times as a person may see fit, when his presence in public is not demanded by any rule of law. . . ." Id. Stated succinctly, the Court ringingly endorsed the "right 'to be let alone' so long as [one] was not interfering with the rights of other individuals or of the public." Id.[2]

In the ensuing years since *Pavesich* was decided and Georgia's right of privacy recognized, the Georgia appellate courts have expounded on the right of privacy, describing it as protection for the individual from unnecessary public scrutiny (*Athens Observer v. Anderson*, 245 Ga. 63 (263 SE2d 128) (1980)); as the right of the individual "to be free from . . . the publicizing of one's private affairs with which the public has no legitimate concern" (*Gouldman-Taber Pontiac v. Zerbst*, supra, 213 Ga. at 683); "the right to define one's circle of intimacy" (*Macon-Bibb County Water &c. Auth. v. Reynolds*, 165 Ga. App. 348, 350 (299 SE2d 594) (1983)); and the right "to be free of unwarranted interference by the public about matters [with] which the public is not necessarily concerned, or to be protected from any wrongful intrusion into an individual's private life which would outrage . . . a person of ordinary sensibilities." *Georgia Power Co. v. Busbin*, 149 Ga. App. 274 (6) (254 SE2d 146) (1979). This Court has determined that a citizen's right of privacy is strong enough to withstand a variety of attempts by the State to intrude in the citizen's life. In *Zant v. Prevatte*, 248 Ga. 832 (286 SE2d 715) (1982), the Court ruled that the State's assertion of a duty to protect a prisoner's health and its interest in preserving human life did not amount to the compelling state interest which could override a sane state prisoner's refusal to eat or submit to medical treatment for the effects of starvation. In *State of Georgia v. McAfee*, 259 Ga. 579 (385 SE2d 651) (1989), the Court again ruled that a citizen's constitutional right of privacy and liberty under which he refused medical treatment was not outweighed by any interest the State might have in the preservation of life. In *Harris v. Cox Enterprises*, 256 Ga. 299, 302 (348 SE2d 448) (1986), Georgia's strong public policy in favor of open government was required to bend in favor of the individual's right of privacy when matters about which the public had no legitimate concern were at issue. It is clear from the right of privacy appellate jurisprudence which emanates from *Pavesich* that the "right to be let alone" guaranteed by the Georgia Constitution is far more extensive that the right of privacy protected by the U. S. Constitution, which protects only those matters "deeply rooted in this Nation's history and tradi-

---

[2] The Court saw the right of persons to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures as an "implied recognition of the existence of a right of privacy. . . ." Id. at 198-199.

tion" or which are "implicit in the concept of ordered liberty. . . ." *Bowers v. Hardwick*, 478 U. S. 186, 191-192 (106 SC 2841, 92 LE2d 140) (1986).[3]

While Georgia citizens' right to privacy is far-reaching, that is not to say that the individual's right to privacy is without limitation. The *Pavesich* court recognized that the right could be waived by the individual (122 Ga. at 199); could be subsumed when the individual was required to "perform public duties . . ." (id. at 196), and had to yield "in some particulars . . . to the right of speech and of the press." Id. at 204. See also *Cox v. Brazo*, 165 Ga. App. 888 (303 SE2d 71) (1983) (individual has no right of privacy in information published by another when individual had publicized the information); *Cabaniss v. Hipsley*, 114 Ga. App. 367 (151 SE2d 496) (1966) (exotic dancer has no right of privacy in a photo which she had permitted others to use for publicity purposes); *Cummings v. Walsh Constr. Co.*, 561 FSupp. 872 (S.D. Ga. 1983) (under Georgia law, a supervisor does not violate a woman's right of privacy by telling co-workers of their affair when the woman had told other co-workers of the relationship). Nor will an individual's right of privacy serve as the basis for liability against one who publishes facts which are a matter of public record (*Reece v. Grissom*, 154 Ga. App. 194 (267 SE2d 839) (1980)), or against one

---

[3] It is a well-recognized principle that a state court is free to interpret its state constitution in any way that does not violate principles of federal law, and thereby grant individuals more rights than those provided by the U. S. Constitution. Nowak, Rotunda & Young, *Constitutional Law*, § 1.6 (c), p. 21 (3rd ed.). Thus, a state court may interpret a state constitutional provision as affording more protection to citizens than have the federal courts in interpreting a parallel provision of the federal constitution. See *Creamer v. State*, 229 Ga. 511 (3) (192 SE2d 350) (1972). On several fronts, the Georgia Constitution has been construed as providing greater protection to its citizens than does the federal constitution. *State v. Miller*, 260 Ga. 669 (398 SE2d 547) (1990) (Georgia Constitution provides broader protection than the First Amendment); *Green v. State*, 260 Ga. 625 (398 SE2d 360) (1990) (Georgia Constitution grants a broader right against self-incrimination than the federal constitution); *Fleming v. Zant*, 259 Ga. 687, 690 (386 SE2d 339) (1989) (Georgia Constitution provides a more extensive guarantee against cruel and unusual punishment than does the federal constitution); *Colonial Pipeline Co. v. Brown*, 258 Ga. 115 (3) (365 SE2d 827) (1988) (Georgia Constitution's excessive fines clause is more expansive than the Eighth Amendment); *D. B. v. Clarke County Bd. of Ed.*, 220 Ga. App. 330 (1) (469 SE2d 438) (1996) (Georgia Constitution's guarantee of a free education is broader than that provided by the U. S. Constitution). See also *Grissom v. Gleason*, 262 Ga. 374, n. 1 (418 SE2d 27) (1992), where this Court observed that Georgia's equal protection clause might be interpreted to offer greater rights than the equal protection clause found in the federal constitution.

Georgia is not alone in providing its citizens with a broader right of privacy than that provided by the federal constitution. Appellate courts in Montana (*Gryczan v. State*, 942 P2d 112 (Mont. 1997)); Tennessee (*Campbell v. Sundquist*, 926 SW2d 250 (Tn. App. 1996)); Kentucky (*Commonwealth v. Wasson*, 842 SW2d 487 (Ky. 1993)); Texas (*Texas State Emp. Union v. Dept. of Mental Health &c.*, 746 SW2d 203 (Tex. 1987)); and New Jersey (*State v. Saunders*, 381 A2d 333 (N.J. 1977)), have all interpreted the right of privacy guaranteed by their respective state constitutions as being more extensive than that provided by the U. S. Constitution.

who publishes photographs of the subject matter of a public investigation. *Waters v. Fleetwood*, 212 Ga. 161 (91 SE2d 344) (1956). See also *Tucker v. News Pub. Co.*, 197 Ga. App. 85 (1) (397 SE2d 499) (1990) (publication of information connected with a matter of public interest or a public investigation does not violate the right of privacy). Through the appeals of defendants convicted of sexual assault who have asserted the constitutional right of privacy on appeal, we have ruled that a defendant may not successfully assert a privacy right when the acts are committed: in a public place (*Stover v. State*, supra, 256 Ga. 515 (1)); in exchange for money (*Ray v. State*, 259 Ga. 868 (3) (389 SE2d 326) (1990)); or with those legally incapable of consenting to sexual acts. Id.; *Richardson v. State*, 256 Ga. 746 (2) (353 SE2d 342) (1987).[4]

Today, we are faced with whether the constitutional right of privacy screens from governmental interference a non-commercial sexual act that occurs without force in a private home between persons legally capable of consenting to the act. While *Pavesich* and its progeny do not set out the full scope of the right of privacy in connection with sexual behavior, it is clear that unforced sexual behavior conducted in private between adults is covered by the principles espoused in *Pavesich* since such behavior between adults in private is recognized as a private matter by "[a]ny person whose intellect is in a normal condition. . . ." *Pavesich*, supra at 194. Adults who "withdraw from the public gaze" (id. at 196) to engage in private, unforced sexual behavior are exercising a right "embraced within the right of personal liberty." Id. We cannot think of any other activity that reasonable persons would rank as more private and more deserving of protection from governmental interference than unforced, private, adult sexual activity. See *Gryczan v. State*, 942 P2d 112 (Mont. 1997); *Campbell v. Sundquist*, 926 SW2d 250 (Tn. App. 1996); *State v. Morales*, 826 SW2d 201 (Tex. App. 1992), rev'd on other grounds, 869 SW2d 941 (Tex. 1994). We conclude that such activity is at the heart of the Georgia Constitution's protection of the right of privacy.

Having determined that appellant's behavior falls within the area protected by the right of privacy, we next examine whether the

---

[4] In *King v. State*, 265 Ga. 440 (3) (458 SE2d 98) (1995), we affirmed King's conviction for an act of sodomy performed with his 16-year-old stepdaughter. We declined to address whether his right to privacy and intimate association, as guaranteed by the federal constitution, was violated because "no factfinder had established that . . . [the] stepdaughter was a willing participant in the acts." To the extent that the holding can be read as implying that "willing participation," i.e., consent, must be affirmatively established before one may invoke a right of privacy concerning acts of sodomy, it is overruled. The Georgia sodomy statute does not require an affirmative finding of consent to support a sodomy conviction. Rather, evidence of a lack of consent is necessary to establish aggravated sodomy. OCGA § 16-6-2 (a).

government's infringement upon that right is constitutionally sanctioned. As judicial consideration of the right to privacy has developed, this Court has concluded that the right of privacy is a fundamental right (*Ambles v. State*, supra, 259 Ga. 406 (b)) and that a government-imposed limitation on the right to privacy will pass constitutional muster if the limitation is shown to serve a compelling state interest and to be narrowly tailored to effectuate only that compelling interest. *Phagan v. State*, 268 Ga. 272 (1) (486 SE2d 876) (1997); *Zant v. Prevatte*, supra, 248 Ga. at 833-834. But see *Christensen v. State*, 266 Ga. 474 (2) (a) (468 SE2d 188) (1996), where the Court's plurality opinion employed the "legitimate state interest" yardstick to measure the State's limitation on the defendant's asserted right of privacy.[5] Implicit in our decisions curtailing the assertion of a right to privacy in sexual assault cases involving sexual activity taking place in public, performed with those legally incapable of giving consent, performed in exchange for money, or performed with force and against the will of a participant, is the determination that the State has a role in shielding the public from inadvertent exposure to the intimacies of others, in protecting minors and others legally incapable of consent from sexual abuse, and in preventing people from being forced to submit to sex acts against their will. The State fulfills its role in preventing sexual assaults and shielding and protecting the public from sexual acts by the enactment of criminal statutes prohibiting such conduct: OCGA § 16-6-1 (rape); § 16-6-2 (a) (aggravated sodomy); § 16-6-3 (statutory rape); § 16-6-4 (child molestation and aggravated child molestation); § 16-6-5 (enticing a child for indecent purposes); § 16-6-5.1 (sexual assault of prisoners, the institutionalized, and the patients of psychotherapists); § 16-6-6 (bestiality); § 16-6-7 (sexual assault of a dead human being); § 16-6-8 (public indecency); §§ 16-6-9—16-6-12 (prostitution, pimping, pandering); § 16-6-15 (solicitation of sodomy); § 16-6-16 (masturbation for hire); § 16-6-22 (incest); §§ 16-6-22.1 and 16-6-22.2 (sexual battery and aggravated sexual battery), and by the vigorous enforcement of those laws through the arrest and prosecution

---

[5] As authority for the position that the State need only establish that legislation alleged to intrude upon the right of privacy has a "reasonable relation to a legitimate state purpose[,]" the *Christensen* plurality cited *Blincoe v. State*, 231 Ga. 886 (1) (204 SE2d 597) (1974). In that case, this Court stated, "It cannot be questioned that the state has no right, under the guise of exercising the police power, to invade the personal rights and liberty of the individual citizen by legislation which has no reasonable relation to a legitimate state purpose." This statement in *Blincoe* sets forth the *threshold* burden which must be met by legislation alleged "to invade the personal rights and liberty of the individual citizen . . . ." It does not affirmatively require a rational review test when an individual invokes a fundamental right such as the right to privacy. In that situation, the State must establish that the legislation under attack serves a compelling state interest and is narrowly drawn to achieve that interest. *Phagan*, supra; *Zant v. Prevatte*, supra.

of offenders. In light of the existence of these statutes, the sodomy statute's raison d'etre can only be to regulate the private sexual conduct of consenting adults, something which Georgians' right of privacy puts beyond the bounds of government regulation.

Citing *Christensen,* supra, 266 Ga. 474, the State reminds us that the plurality decision therein held that the proscription against sodomy was a valid exercise of the State's police power in furtherance of the public's moral welfare, and that the Georgia Constitution did not deny the General Assembly the right to prohibit such conduct. "Police power" is the governing authority's ability to legislate for the protection of the citizens' lives, health, and property, and to preserve good order and public morals. *Hayes v. Howell,* 251 Ga. 580 (2) (b) (308 SE2d 170) (1983); *Ward v. State,* 188 Ga. App. 372 (1) (373 SE2d 65) (1988). "To justify the State in thus interposing its authority in behalf of the public, it must appear, first that the interests of the public generally . . . require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." *Lawton v. Steele,* 152 U. S. 133, 137 (14 SC 499, 38 LE 385) (1894). Stated another way, the legislation must serve a public purpose and the means adopted to achieve the purpose must be reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon the persons regulated. *Cannon v. Coweta County,* 260 Ga. 56 (2) (389 SE2d 329) (1990). In recent years, legislative bodies in Georgia have exercised the "police power" to combat the negative effects of the combination of alcohol and nude dancing (*Goldrush II v. City of Marietta,* 267 Ga. 683 (482 SE2d 347) (1997)); to limit land usage through zoning restrictions (*Cannon v. Coweta County,* supra, 260 Ga. 56); to regulate the health professions (*Foster v. Ga. Bd. of Chiropractic Exam.,* 257 Ga. 409 (14) (359 SE2d 877) (1987)); and to impose reasonable regulations on the establishment and operation of cemeteries (*Arlington Cemetery Corp. v. Bindig,* 212 Ga. 698 (2) (95 SE2d 378) (1956)). That the legislative body has determined that it is properly exercising its police powers "is not final or conclusive, but is subject to the supervision of the courts." *Lawton v. Steele,* supra, 152 U. S. at 137. Thus, the suggestion that OCGA § 16-6-2 is a valid exercise of the police power requires us to consider whether it benefits the public generally without unduly oppressing the individual. Since, as determined earlier, the only possible purpose for the statute is to regulate the private conduct of consenting adults, the public gains no benefit, and the individual is unduly oppressed by the invasion of the right to privacy. Consequently, we must conclude that the legislation exceeds the permissible bounds of the police power. See *Commonwealth v. Bonadio,* 415 A2d 47, 49-50 (Pa. 1980).

The State also maintains that the furtherance of "social moral-

ity," giving "due regard to the collective will of the citizens of Georgia," is a constitutional basis for legislative control of the noncommercial, unforced, private sexual activity of those legally capable of consenting to such activity. It is well within the power of the legislative branch to establish public policy through legislative enactment. It is also without dispute that oftentimes the public policy so established and the laws so enacted reflect the will of the majority of Georgians as well as the majority's notion of morality. However, "it does not follow . . . that simply because the legislature has enacted as law what may be a moral choice of the majority, the courts are, thereafter, bound to simply acquiesce." *Gryczan v. State*, supra, 942 P2d at 125 (where the Supreme Court of Montana ruled that private consensual, noncommercial sexual conduct is protected by Montana's constitutional right of individual privacy). "Social morality legislation," like any legislative enactment, is subject to the scrutiny of the judicial branch under our tripartite system of "checks and balances." See *Cantrell v. State of Ga.*, 129 Ga. App. 465 (200 SE2d 163) (1973).

In undertaking the judiciary's constitutional duty, it is not the prerogative of members of the judiciary to base decisions on their personal notions of morality. Indeed, if we were called upon to pass upon the propriety of the conduct herein involved, we would not condone it. Rather, the judiciary is charged with the task of examining a legislative enactment when it is alleged to impinge upon the freedoms and guarantees contained in the Georgia Bill of Rights and the U. S. Constitution, and scrutinizing the law, the interests it promotes, and the means by which it seeks to achieve those interests, to ensure that the law meets constitutional standards. While many believe that acts of sodomy, even those involving consenting adults, are morally reprehensible, this repugnance alone does not create a compelling justification for state regulation of the activity. *Post v. State*, 715 P2d 1105, 1109 (Okla. Cr. App.) cert. denied 479 U. S. 890 (107 SC 290, 93 LE2d 264) (1986) (where the Oklahoma appellate court held that a statute violated the federal right of privacy when applied to "non-violent consensual activity between adults in private.") See also *Campbell v. Sundquist*, supra, 926 SW2d at 266; *Commonwealth v. Wasson*, supra, 842 SW2d at 498; *Commonwealth v. Bonadio*, supra, 415 A2d at 50 (where appellate courts in Tennessee, Kentucky, and Pennsylvania concluded that "no sufficient state interest justifies legislation of norms simply because a particular belief is followed by a number of people, or even a majority."[6]) We

---

[6] We are reminded of what Justice Oliver Wendell Holmes said in a dissent in *Lochner v. New York*, 198 U. S. 45, 76 (25 SC 539, 49 LE 937) (1905): "[The Constitution] is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution. . . ."

agree with our fellow jurists that legislative enactments setting "social morality" are not exempt from judicial review testing their constitutional mettle.

We conclude that OCGA § 16-6-2, insofar as it criminalizes the performance of private, unforced, non-commercial acts of sexual intimacy between persons legally able to consent, "manifestly infringes upon a constitutional provision" (*Miller v. State*, supra, 266 Ga. 850 (2)) which guarantees to the citizens of Georgia the right of privacy. Appellant was convicted for performing an unforced act of sexual intimacy with one legally capable of consenting thereto in the privacy of his home. Accordingly, appellant's conviction for such behavior must be reversed.

*Judgment reversed. All the Justices concur, except Carley, J., who dissents.*

SEARS, Justice, concurring.

In broad terms, the dissent urges that once the legislature criminalizes any activity, courts are forbidden from passing on the "wisdom" of such laws.[7] Otherwise, the dissent foretells that "anarchy" will reign.[8] In making these statements, the dissent mischaracterizes the majority opinion. In this opinion, this Court in no way usurps the legislative function of promulgating social policy. Rather, in an inspired opinion, a majority of this Court today has fulfilled its constitutional responsibility within the American tripartite system of checks and balances. As well stated in the majority opinion, merely because the legislature has enacted a law which may impact upon the public's moral choices, courts are not "bound to simply acquiesce."[9] It is the duty of this Court, and all courts, to ensure that, absent a compelling state interest, legislative acts do not impinge upon the inalienable rights guaranteed by our State Constitution. The dissent would default on its constitutional duty to protect these rights, and would defer instead to what it believes to be the moral choice of a majority.[10] Yet, it is the very definition of a constitutional right that it cannot be made wholly subject to the will of the majority.[11] Otherwise, the principles that serve as bedrock for our

---

[7] Dissent at 344.

[8] Id. at 340.

[9] Majority op. at 335.

[10] As once noted by United States Supreme Court Justice Hugo Black, it is a commonly-held misconception that "the Constitution prohibits that which [the majority] thinks should be prohibited, and permits that which they think should be permitted." *Newsweek*, Dec. 9, 1968 at p. 52.

[11] *West Virginia Bd. of Ed. v. Barnette*, 319 U. S. 624, 637-638 (63 SC 1178, 87 LE2d 1628) (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials. . . . One's right[s] . . . may not be submitted to vote; they depend on the outcome of no election.").

Federal and State Bill of Rights will be reduced to mere rhetoric.

This nation was founded upon a great moral precept — that all persons are entitled to the free exercise of their liberty, which:

> [E]mbraces the right of a [person] to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. Liberty includes the right to live as one will, so long as that will does not interfere with the rights of another or of the public. . . . All are entitled to liberty of choice as to his manner of life, and neither an individual nor the public has a right to arbitrarily take away from him his liberty.[12]

The individual's right to freely exercise his or her liberty is not dependent upon whether the majority believes such exercise to be moral, dishonorable, or wrong. Simply because something is beyond the pale of "majoritarian morality" does not place it beyond the scope of constitutional protection. To allow the moral indignation of a majority (or, even worse, a loud and/or radical minority) to justify criminalizing private consensual conduct would be a strike against freedoms paid for and preserved by our forefathers. Majority opinion should never dictate a free society's willingness to battle for the protection of its citizens' liberties. To allow such a thing would, in and of itself, be an immoral and insulting affront to our constitutional democracy.

There will, of course, be those who will criticize today's decision, and who may even seek to demonize some members of this Court for their legal analysis. This pattern of personally attacking and pillorying individuals who disagree with certain positions, rather than engaging in constructive ideological discourse with them, has regrettably become more and more prevalent in our culture. Those who would make such personal attacks, however, do not fully appreciate that all of my colleagues, those who agree with the majority as well as those who dissent, are honorable and decent jurists who struggle to fulfill their constitutional responsibilities to the people of this State.

Today, a majority of this Court fulfills its duties with a clear-headed and courageous decision. I fully concur with it.

CARLEY, Justice, dissenting.

"The responsibility of this Court . . . is to construe and enforce the Constitution and laws of the [State] as they are and not to legis-

---

[12] *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 196 (50 SE2d 68) (1905).

late social policy on the basis of our own personal inclinations." *Evans v. Abney*, 396 U. S. 435, 447 (90 SC 628, 24 LE2d 634) (1970). The issue in this case is not whether private and consensual acts of sodomy should be legal or illegal in Georgia, because that question has already been resolved by the General Assembly. Under the unambiguous provisions of OCGA § 16-6-2 (a), commission of an act of sodomy is against the criminal law of this state, and performance of such an act in private between consenting adults is not exempted from that statutory prohibition. Therefore, the only issue presented for decision is whether the General Assembly has the constitutional authority to prohibit such conduct. This Court is not authorized to impede the State's unrestricted enforcement of OCGA § 16-6-2 (a) unless that statute manifestly impinges upon a constitutional right of adults to perform consensual sodomy in private. See *Bohannon v. State*, 269 Ga. 130, 131 (2) (497 SE2d 552) (1998). Clearly, Powell has no right under the federal constitution to engage in the act proscribed by OCGA § 16-6-2 (a), since there is no fundamental right under the Constitution of the United States to engage in consensual sodomy. "Sodomy was a criminal offense at common law and was forbidden by the laws of the original thirteen States when they ratified the Bill of Rights." *Bowers v. Hardwick*, 478 U. S. 186, 192 (106 SC 2841, 92 LE2d 140) (1986). Today, however, a majority of this Court concludes that our state constitution does confer upon the citizens of Georgia a fundamental right to engage in a consensual act which the majority itself concedes, as it must, that many Georgians find "morally reprehensible." I believe that, in so holding, the majority not only misconstrues the Constitution of Georgia, but that it also violates the fundamental constitutional principle of separation of powers. It is my opinion that there is no state constitutional impediment to the General Assembly's enactment of OCGA § 16-6-2 (a) and that, by holding otherwise, the Court has exceeded the limits of its judicial authority and usurped the legislative power "to enact laws to promote the public health, safety, morals, and welfare of its citizens." *Christensen v. State*, 266 Ga. 474, 476 (2) (a) (468 SE2d 188) (1996). Therefore, the only perceptible unconstitutionality in this case is that which is evidenced by the majority's determination, acting as social engineers rather than as jurists, to elevate their notion of individual "liberty" over the collective wisdom of the people's elected representatives that a proscription on sodomy, consensual or otherwise, is "in furtherance of the moral welfare of the public." *Christensen v. State*, supra at 476 (2) (a). Therefore, I respectfully, but vigorously, dissent to the holding that OCGA § 16-6-2 (a) is unconstitutional.

The premise of the majority is that the right of privacy guaranteed by the Georgia Constitution grants to the citizens of this state the right to engage in private consensual sodomy. Unlike the consti-

tutions of some other states, the Georgia Constitution contains no express recognition of a right to privacy. Compare *Gryczan v. State*, 942 P2d 112, 121 (Mont. 1997). That right stems entirely from this Court's holding in *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190 (50 SE 68) (1905). *Pavesich* does not hold that the citizens of this state have an immutable constitutional right to engage in a private consensual act of sodomy or in any other conduct which constitutes a crime pursuant to an enactment of the General Assembly. It merely defines the right of privacy generally, as an implicit element of the "liberty" guaranteed to Georgia citizens under the Due Process Clause of the state constitution. *Pavesich*, supra at 197. In accordance with *Pavesich*, supra at 195, an individual's liberty and, hence, his privacy is not completely unrestricted, but is subject to " 'such restraints as are necessary for the common welfare.' " Thus, a citizen of Georgia does not have the right "to violate the valid regulations of the organized government under which he lives." *Pavesich*, supra at 194. At the time *Pavesich* was decided, one such valid regulation was a criminal statute of this state which prohibited a citizen's commission of an act of sodomy, without regard to whether that act was consensual and private. *Herring v. State*, 119 Ga. 709, 720 (2) (46 SE 876) (1904). Indeed, the original statutory law of Georgia made it a crime to engage in an act of sodomy, and the punishment upon conviction was " 'imprisonment at labor in the penitentiary for and during the natural life of the person convicted of this de[te]stable crime.' [Cit.]" *Warren v. State*, 255 Ga. 151, 157 (2) (336 SE2d 221) (1985). Moreover, sodomy " 'was a felony by the ancient common law.' " *Herring v. State*, supra at 720 (2). See also *Bowers v. Hardwick*, supra at 192; Anno., 20 ALR4th 1009, 1014 § 2 [a]. Thus, even assuming that the general constitutional right to privacy recognized by *Pavesich* was broad enough to encompass participation in certain private consensual sexual acts, it nevertheless is undeniable that sodomy could not have been included among those protected acts, since that sexual practice was expressly made criminal by the statutory law of this state.

Although, as the majority notes, the right of privacy has a long history in Georgia dating from *Pavesich*, until today this Court has never cited that right as authority for the incongruous proposition that a citizen is at liberty to commit an act which has constituted criminal conduct throughout the even longer history of Georgia as a state and, indeed, throughout the entire history of English common law. In its haste to confer upon Powell a constitutionally protected right to engage in private consensual acts of sodomy, the majority simply seizes upon *Pavesich*'s general recognition of the guarantee of "liberty" afforded to Georgia citizens under the state constitution, while choosing to ignore completely *Pavesich*'s equally important rec-

ognition of the principle that Georgia citizens also have the responsibility to comply with this state's criminal law. Thus, unlike the majority, I believe that *Pavesich* is clear-cut authority for the proposition that a violation of the criminal law of this state can never be justified as an element of the "liberty" guaranteed by the Due Process Clause of this state's constitution. In my opinion, freedom to violate the criminal law is simply anarchy and, thus, the antithesis of an ordered constitutional system.

Subsequent to the decision in *Pavesich*, this state's criminal statutes have maintained an unrestricted proscription on commission of sodomy, whereas our present constitution still contains a Due Process Clause that does not expressly recognize the right of Georgia citizens to engage in that act even in private and with the consent of the participants. The only factor which has changed since *Pavesich* was decided is the composition of this Court. Thus, the proper question to be resolved in this case is whether this Court will misconstrue *Pavesich* and reinterpret our state constitution in such a way as to deprive the General Assembly of its authority to prohibit consensual and private acts of sodomy.

> It is an established rule of constitutional construction that, where a provision has received a settled judicial interpretation and is then incorporated into a new constitution, it will be presumed to have been retained with the knowledge of the previous construction and the courts will be bound to adhere thereto. [Cit.]

*Atlanta Independent School Sys. v. Lane*, 266 Ga. 657, 658 (2) (469 SE2d 22) (1996). Because *Pavesich* clearly interprets the constitutional right of privacy as subject to compliance with this state's criminal statutes and because there has been no constitutional change which would authorize Georgia citizens to engage in private and consensual sodomy, it is clear that Powell's attack on the constitutionality of OCGA § 16-6-2 (a) is without merit. The Due Process Clause of the Georgia Constitution does not afford the citizens of this state the right to engage in private consensual conduct which has been proscribed by a criminal law enacted by our General Assembly. See *State v. Lopes*, 660 A2d 707, 710 (R.I. 1995); *State v. Bateman*, 547 P2d 6, 10 (V) (Ariz. 1976); *Everette v. State*, 465 SW2d 162 (Tex. Crim. App. 1971); 81 CJS, Sodomy, § 3, p. 648.

This is precisely the issue addressed in *Christensen*, supra at 476 (2) (a), wherein, less than three years ago, a majority of this Court upheld the constitutionality of the statute, and the plurality opinion held that

the proscription against sodomy is a legitimate and valid exercise of state police power in furtherance of the moral welfare of the public. Our constitution does not deny the legislative branch the right to prohibit such conduct. Accordingly, OCGA § 16-6-2 does not violate the right to privacy under the Georgia Constitution.

See also *State v. Bateman*, supra at 10 (V). The majority simply dispenses with this holding in *Christensen*, concluding that, because no third party is harmed by a consensual and private act of sodomy, the General Assembly is without the constitutional authority to proscribe commission of that act. In discounting *Christensen*, however, the majority appears to be motivated by the erroneous premise that victimless consensual and private acts of sodomy are a realistic target for the State's enforcement of OCGA § 16-6-2 (a). If an act of sodomy is truly consensual and private, it would be impractical to enforce the statute against the participants, since both would be guilty of the crime of sodomy and, consequently, there would be no victim to file charges and initiate a prosecution. See *Perryman v. State*, 63 Ga. App. 819, 822 (12 SE2d 388) (1940); *Pruett v. State*, 463 SW2d 191, 193 (Tex. Crim. App. 1970). If, however, the act takes place in a public place or in the presence of a non-condoning non-participant, it can be subject to prosecution as a non-private act. *Christensen*, supra. If the act takes place in private and one of the participants files criminal charges against the other, it can be subject to prosecution as a non-consensual act. The prosecution against Powell certainly was not initiated because he was alleged to have engaged in a private and consensual act of sodomy. To the contrary, he was prosecuted only because the victim alleged that he committed an act of forcible sodomy against her. There is no contention that the evidence at trial would not have authorized a finding that Powell's private act of sodomy was non-consensual. Although the jury found Powell guilty of consensual sodomy, the fact nevertheless remains that the prosecution was initiated and pursued only because one of the participants initially alleged and subsequently testified under oath that she did not consent to the act of sodomy.

More importantly, however, the majority cites no authority as support for its adoption of the novel proposition that the constitutionality of a criminal statute is somehow dependent upon whether anyone other than the actual participants themselves are adversely affected by the proscribed act. Presumably, under this new standard, the State can no longer enforce laws against fornication or adultery. See *Bowers v. Hardwick*, supra at 195-196. Thankfully, the majority includes incest among those sexual acts which it will continue to permit the State to proscribe as criminal. However, the majority offers

no analytical or conceptual distinction between the crimes of sodomy and incest when committed by consenting adults. Neither a public performance of the proscribed sexual act, an exchange of money nor the use of force is an element of either offense as defined by the General Assembly. See OCGA §§ 16-6-2; 16-6-22. The only conclusion to be drawn is that the majority simply has decided that legislative proscription of the right of adults to engage in consensual sodomy is now politically incorrect and unconstitutional, but that it still is politically correct and constitutional for the General Assembly to prohibit adult relatives from engaging in consensual sexual intercourse. The majority opinion will have anomalous results. For example, it remains criminal for a father and his adult daughter or stepdaughter to engage in consensual sexual intercourse, but they may now lawfully perform consensual acts of anal and oral sodomy.

Moreover, the majority does not purport to limit to sexual offenses the application of its new found authority to declare this state's criminal statutes unconstitutional. By equating the general constitutional guarantee of "liberty" to all Georgia citizens with the right of each individual citizen to engage in self-indulgent but self-contained acts of permissiveness, it appears that the majority has now called into constitutional question any criminal statute which proscribes an act that, at least to the satisfaction of a majority of this Court, does not cause sufficient harm to anyone other than the actual participants. Thus, to give but one example, the constitutionality of criminal laws which forbid the possession and use of certain drugs has suddenly become questionable. See *Bowers v. Hardwick*, supra at 195.

Until the majority's advancement of its overly expansive notion of the state constitutional guarantee of "liberty," there has never been any doubt that the General Assembly, in the exercise of the police power, has the authority to define as crimes the commission of acts which, without regard to the infliction of any other injury, are considered to be immoral. Simply put, commission of what the legislature has determined to be an immoral act, even if consensual and private, is an injury against society itself. "[T]he protection of 'societal order and morality' [is] a 'substantial government interest.'" *Christensen*, supra at 476 (2) (a), fn. 6. The law "is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." *Bowers v. Hardwick*, supra at 196. See also *Christensen v. State*, supra at 476 (2) (a); *State v. Walsh*, 713 SW2d 508, 511-512 (Mo. 1986). The only justification given by the majority for concluding that OCGA § 16-6-2 (a) cannot be upheld as a constitutional exercise of the State's police power to proscribe immoral conduct is that, in Georgia, the right to engage in consen-

sual and private sodomy, although legislatively determined to be morally reprehensible, is guaranteed under our constitution. As previously demonstrated, however, this constitutional "right" to engage in sodomy has been manufactured out of whole cloth by the majority's misconstruction of *Pavesich*. A constitutional right to privacy obviously cannot include the right to engage in private conduct which was condemned as criminal at the very time that the constitution was ratified. No reasonable Georgian would consider that the effect of voting to ratify a general constitutional guarantee of "liberty" would be to divest his or her elected legislators of the right to continue the specific statutory proscription against sodomy or any other criminal act. To the contrary, any reasonable citizen of this state would consider that he or she thereby was retaining the liberty to make such determinations for themselves through their elected legislators. The majority, having simply invented the constitutional right to engage in sodomy in the first instance, then relies upon that fictional right as support for its ultimate conclusion that the General Assembly has no constitutional authority to proscribe that conduct. A reviewing court should strive "to assure itself and the public that announcing rights not readily identifiable in [a c]onstitution's text involves much more than the imposition of the Justices' own choice of values." *Bowers v. Hardwick*, supra at 191. Given the utter lack of support for the purported constitutional right to engage in sodomy, I can only conclude that the majority has chosen to substitute its own public policy determination for that of the General Assembly.

In stark and telling contrast to the majority's analysis, *Christensen* is based firmly upon the bedrock constitutional principle of separation of powers, which principle is "essential to the very foundation of our system of government" and must "be strictly enforced." *McCutcheon v. Smith*, 199 Ga. 685, 690-691 (2) (35 SE2d 144) (1945). "It is the prerogative of the judiciary to determine what the law is, and the responsibility of the legislature to declare what the law shall be. [Cit.]" *Pearle Optical of Monroeville v. State Bd. of Examiners in Optometry*, 219 Ga. 364, 373 (2) (133 SE2d 374) (1963). Thus, this Court's authority extends only to the correction of errors of law, and we have no legislative powers or functions. *Jacobs v. State of Ga.*, 200 Ga. 440, 445 (37 SE2d 187) (1946). "[T]he legislature, and not the courts, is empowered by the Constitution to decide public policy, and to implement that policy by enacting laws; and the courts are bound to follow such laws if constitutional." *Commonwealth Inv. Co. v. Frye*, 219 Ga. 498, 499 (2) (134 SE2d 39) (1963). In exercising the judicial authority to determine the constitutionality of statutes duly enacted by our General Assembly, it is our solemn duty "not to pronounce against them, except in a clear case, and to make every intendment

possible in favor of their constitutionality." *Gormley v. Taylor*, 44 Ga. 76, 77 (2) (1871).

> Legislatures alone determine the wisdom of laws, and courts, despite their belief that the law is unwise, nevertheless are bound by the Constitution to confine their considerations of such laws to their constitutionality alone. Courts possess neither the facilities, the experience, nor the wisdom of legislators to qualify them to pass upon the wisdom of laws.

*Sims v. State*, 221 Ga. 190, 204 (5) (c) (144 SE2d 103) (1965), rev'd on other grounds, 385 U. S. 538 (87 SC 639, 17 LE2d 593) (1967). According to the majority, OCGA § 16-6-2 (a) is unconstitutional for the entirely erroneous reason that, by ratifying the Constitution of Georgia, this state's voters implicitly guaranteed the right of its citizens to commit an act which its legislators nevertheless have expressly determined should continue to be prohibited. Retaining the long-standing proscription on sodomy may or may not be good public policy, but it is a public policy determination which, as a matter of constitutional law, only the General Assembly can make. *State v. Bateman*, supra at 10 (V); Note, Doe and Dronenburg: Sodomy Statutes are Constitutional, 26 Wm. & Mary L. Rev. 645 (1985). Thus, in *Christensen v. State*, supra at 477 (3), we held that "[t]he right to determine what is harmful to health and morals or what is criminal to the public welfare belongs to the people through their elected representatives." *Christensen v. State*, supra at 477 (3). Unfortunately, as of today, that is no longer the law of this state. By holding that the constitutional guarantee of "liberty" precludes the General Assembly from enacting an express ban on the commission of consensual private acts of sodomy, the Court has usurped the legislative authority of the General Assembly to establish the public policy of this state.

The majority promotes itself as a judicial defender of constitutional rights against the imposition by the General Assembly of those "norms" of "societal morality" held by most Georgia citizens. The majority should be cautioned, however, that the constitution which it now so readily undertakes to amend by judicial fiat can just as easily be rewritten yet again by any future Court which discovers another constitutional right where none ever existed. The Constitution of Georgia is the original law by which the government of this state was established. *Wheeler v. Bd. of Trustees of Fargo Consolidated School Dist.*, 200 Ga. 323, 331 (3) (37 SE2d 322) (1946). As such, our constitution should not be subject to judicial amendment so as to express whatever a majority of this Court happens to conclude at any given time is the more enlightened viewpoint on a particular controversial

issue. If our constitution can be judicially amended in such a manner, that constitutes government by this Court, rather than government through a constitutional system of which this Court is a separate and equal branch. In accordance with today's opinion, any and all disaffected groups who are unable to obtain legislative redress need only convince a majority of this court that what they seek is an implicit "right" protected by the general guarantee of "liberty" afforded by the Due Process Clause of the Georgia Constitution. Contrary to this analysis, however, our constitution wisely provides for separation of powers, and authorizes the General Assembly to make the public policy determinations in this state. Under our constitution, therefore, the public policy of Georgia on the practice of sodomy is a matter within the exclusive jurisdiction of the legislature. Accordingly, we should continue to "decline to usurp that which is the power of the legislature." *Christensen v. State*, supra at 477 (3). By this dissent, I am not opining that what the majority has wrought today should or should not be done or can or cannot be done. I am saying simply that this Court should not, and indeed constitutionally cannot, do it.

In the apparent belief that there is safety in numbers, the majority notes that it is not alone in interpreting a state constitutional right of privacy so broadly as to include the right to engage in sodomy. What the majority fails to acknowledge, however, is that most states in which consensual sodomy is no longer a crime achieved that result "by legislative repeal of their laws criminalizing sodomy." *Christensen v. State*, supra at 476-477 (3). See also Recent Case, State Constitutions — Homosexual Sodomy, &c., 106 Harv. L. Rev. 1370, 1373, fn. 27 (1993). Thus, the majority should take no comfort in the fact that it has removed Georgia from the rank of those states which have held that the matter is for resolution by the legislature. See, e.g., *State v. Bateman*, supra at 10 (V); *Critchlow v. State*, 346 NE2d 591, 596 (Ind. 1976); *Carter v. State*, 500 SW2d 368, 371 (Ark. 1973); *People v. Hurd*, 85 Cal. Rptr. 718, 726 (Cal. App. 1970). In the exercise of its police power, the General Assembly has determined that the long-recognized ban on sodomy should remain in place. That ban applies only to acts, not to persons or groups.

> [I]t is not a proper function for any court to judicially repeal laws on purely sociological considerations — [Powell] would do better to address . . . the General Assembly for it to determine if modern mores require the alteration or expunction of sodomy statutes.

*Griffith v. State*, 504 SW2d 324, 326 (Mo. App. 1974). Because the majority's discovery of a constitutional right to engage in sodomy notwithstanding this legislative ban is based upon a serious misinter-

pretation of the Constitution of Georgia and is completely contrary to the constitutional principle of separation of powers, I dissent.

DECIDED NOVEMBER 23, 1998 —
RECONSIDERATION DENIED DECEMBER 17, 1998.

*Brenda J. Bernstein, Steven H. Sadow,* for appellant.
*Daniel J. Porter, District Attorney, Pamela D. South, Assistant District Attorney,* for appellee.
*Thurbert E. Baker, Attorney General, Michael E. Hobbs, Counsel to the Attorney General, Stephen R. Scarborough, Kelly S. Brown,* amici curiae.